UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DAYOMASHELL DAVID AGUILAR,

                    Petitioner,

    v.

WARDEN TIMOTHY FILSON, *et al.,*

                    Respondents.

Case No. 3:12-cv-00315-MMD-VPC

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on the merits of the remaining grounds, which all present claims of ineffective assistance of trial counsel.

## I.     BACKGROUND

Petitioner Dayomashell David Aguilar challenges his 1998 Nevada state judgment of conviction, pursuant to a jury verdict, of conspiracy to commit murder, first-degree murder with the use of a deadly weapon, discharging a firearm at or into a vehicle, and two counts of discharging a firearm at or into a structure. (ECF No. 14-31.)

David Aguilar was tried jointly in the capital murder trial with his brother, Gilbert Aguilar, who was represented by different defense counsel.

The evidence from the guilt phase tended to establish, *inter alia*, the following.[1]

---

[1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court. Any

According to the trial testimony of by-then Annette Aguilar, on August 7, 1996, she and Gilbert Aguilar had just moved in with his brother David and his girlfriend Gloria "Jeanie" Olivares and her teenage daughter. They lived in the Olivares' unit at 840 Mantis Way, No. 2, in Las Vegas, Nevada. The Olivares' residence was in northeastern Las Vegas, near the intersection of East Washington Avenue and North Pecos Road, south of Washington and east of Pecos. (ECF No. 14-6 at 39; ECF No. 14-7 at 60-62.)

On the evening of August 7, 1996, the Aguilar brothers had gone to the nearby 7-Eleven convenience store at the northwest corner of Washington and Pecos. At around approximately 10:40 p.m., a store clerk told them that they either had to stop drinking beer inside the store or leave. They left the store. Out in the parking lot, Gilbert Aguilar walked up to the driver in a parked vehicle and asked him through the open window where he was from. When the driver did not respond verbally after he asked two or three times, Aguilar attacked the driver, punching him twice through the window. The driver started to drive away, but the two brothers then tried to block the vehicle in by standing in front of and behind the vehicle. The driver hit Gilbert Aguilar with the vehicle and pushed him back with the car twenty to twenty-five feet so that he and his female passenger could escape the attack. After the vehicle drove away to the east on Washington, the brothers walked and then ran in the same direction, which also was the direction of the Olivares' residence. (ECF No. 14-6 at 39, 43-46, 47-58, 60-63; ECF No. 14-8 at 21-39.)

According to Annette Aguilar's testimony, the brothers returned to the Olivares' residence cursing angrily and loudly about what had happened at the 7-Eleven. The brothers armed themselves with two rifles; and David Aguilar donned a black-and-white poncho, which Annette Aguilar positively identified at trial from a photograph. They left the residence with Gilbert Aguilar telling Annette to go with them. Each man was carrying a rifle as they left the unit, with Gilbert carrying his openly while David's rifle was not

absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering Petitioner's claims.

visible after they went outside, apparently due to the poncho. (ECF No. 14-7 at 64-71, 80-87, 100-03, 127-28, 134-36, 150-51.)

Two AK-47-type semiautomatic rifles that fired 7.62 mm caliber rounds later were recovered from the Olivares' residence. An AK-47-type rifle distributed by B-West in Tucson, Arizona ("B-West AK-47 or rifle") was found in a utility closet or laundry room.[2] An Egyptian-made Maadi AK-47-type rifle ("Maadi AK-47 or rifle") with David Aguilar's palm print on it was found on a sofa near a poncho. At trial, Annette Aguilar positively identified the B-West AK-47 and the Maadi AK-47 from photographs as the rifles carried by the two men as they left the Olivares' residence. (ECF No. 14-7 at 80-81, 83, 204-12; ECF No. 14-9 at 75-78, 106-07, 109-11, 117-18, 122-23, 135-37, 143-44; ECF No. 14-10 at 60-64, 67-68, 70-71.)[3]

Annette Aguilar testified that, after leaving the Olivares' residence, she followed the thusly armed Aguilar brothers in the general direction of the 7-Eleven, which was nearby to the west and slightly north on the other side of both Washington and Pecos. (ECF No. 14-7 at 70-71, 103, 128, 131-32, 136.)

Joyce Brown lived at 848 Mantis Way, No. 1, a unit in the four-unit building next door and to the north of the Olivares' residence within the Atrium Gardens subdivision. A walkway separated the two buildings and units. Brown knew both Gloria Olivares and David Aguilar from being neighbors. (ECF No. 14-6 at 66-70, 84-92, 107-09, 111.)

At around 11:00 p.m. that evening, Brown was sitting outside on the front porch of her residence, which faced Mantis Way. While out on her porch, Brown saw David Aguilar walk by wearing a poncho with dark and light colors, "like black and white." He was accompanied by a man and a woman whom she recognized because they recently had been staying at the Olivares' residence. Brown positively identified the second man at

---

[2]The B-West rifle is the subject of Ground 5. Petitioner alleges therein that he was denied effective assistance because trial counsel did not investigate the allegedly possible involvement in the offenses of a police officer from whom the rifle previously had been stolen. Ground 9 also alleges a failure to investigate an alternative suspect.

[3]The Court uses a more generic but not fully accurate "AK-47-type" reference to the rifles, corresponding to that used in the state court record.

trial as Gilbert Aguilar. The three apparently were coming from the Olivares' unit, and they were heading toward Washington, which generally was in the direction of the nearby 7-Eleven. (*Id.* at 70-76, 79, 92-94, 96-99, 109-10, 114-15.)

Gilbert Aguilar was openly carrying a long gun. Brown could not see David Aguilar's hands under the poncho and thus did not see whether he had anything in his hands. It struck Brown as odd that he was wearing a poncho on the hot August Las Vegas night. She heard him say as they were passing by: "It's where the light is, Holmes; it's where the light is." Frightened after seeing Gilbert Aguilar with a rifle, Brown went inside her home and locked the door. (*Id.* at 76-80, 99, 104-06, 113-16.)

The brothers and Annette Aguilar walked toward the 7-Eleven to what she described as a field. According to her testimony, Annette Aguilar, at that time in 1996, could see the 7-Eleven from there. The brothers still were agitated and talking angrily. Annette Aguilar became frightened and crouched down behind a yellow Volkswagen in an adjacent parking area. (ECF No. 14-7 at 70-73, 92, 103-09, 128-29, 132, 136.)

Annette Aguilar heard one of the brothers say "there they go." Immediately thereafter, Annette Aguilar, who was crouched down crying, then began hearing loud and rapid gunfire, with multiple shots being fired. She did not see anyone else other than the brothers during this time, whether in the field, on Washington, or on Pecos. However, she was very nearsighted; and she was, by her own description, panicked and hysterical at the time. (*Id.* at 72-74, 106-10, 128, 136-37.)

Tim Bradford lived with his family at 3508 Valley Forge Avenue, an east-west residential neighborhood street that parallels Washington immediately to the north. The front of the Bradford home faced Valley Forge, and the backyard was on the Washington side of the property. An approximately six-foot high wall separating the backyard from the street and sidewalk faced Washington. The home was three or four houses from the corner of Washington and Pecos. Bradford's home thus was to the north across Washington approximately across the street from the general area where the Aguilar brothers were. (ECF No. 14-8 at 161-63, 165-66, 167-68.)

4

Bradford and his wife's adult nephew were at home at the time. At approximately 11:00 p.m., Bradford was out in front of the house smoking when he heard two loud gunshots, with the sound appearing to come from the back of the house. He went through the house to the backyard to investigate. After Bradford reached the backyard, he heard many more gunshots, now in rapid succession. As he looked over the back wall, he heard sound behind him. When he turned to look back at the house, he saw that the stationary pane in the sliding glass patio door had been shattered "like a spider web," and there was a second hole just to the left of the patio door. The first apparent gunshot was three feet high on the stationary pane, and the other was six feet from the ground. The next day, Bradford found two more apparent bullet holes in the southeast corner of the house as well as a projectile in a kitchen cupboard inside a can of baking soda. (*Id.* at 162-168.)

Terry Maldonado lived at 3525 Jungle Drive, No. 4, with her two daughters. (ECF No. 14-7 at 13-14, 25-27.) Within the subdivision, the north-south Mantis Way forms a "T" intersection with Washington and then runs south from Washington. Jungle Drive, in turn, is a short east-west street that forms a "T" intersection with Mantis Way and runs west from Mantis Way toward but not all the way to Pecos. The 840 Mantis Way address at which Gloria Olivares resided is the fourth building to the south of the intersection with Jungle Drive, on the west side of Mantis Way. The 848 Mantis Way address at which her neighbor Joyce Brown lived is the next building to the north. The 856 Mantis Way address where the Emersons (discussed further *infra*) lived then is the next building to the north. The next building to the north—after a small parking area—carries a Jungle Drive address and lies to the south of Jungle Drive. 3525 Jungle Drive then is the next building over immediately to the west. With north oriented at the top of the view, the foregoing properties form an inverted and reversed "L" shape "pointing" to the west, with an open

///

///

///

///

common area within the corner of the L-shape. The nearby 7-Eleven is off to the north and west of that common area.[4]

According to Terry Maldonado's testimony, at around 11:00 p.m., she and her daughters heard numerous loud gunshots. Maldonado's front door opened out onto an atrium patio that had a gate that in turn opened out into the common area. She went out her front door to the gate, where she heard more shooting. Maldonado had her phone with her, and she called 911. (*Id.* at 13-16.)

Maldonado saw two people out in the common area. A man wearing a poncho was squatting down shooting a shotgun or long gun toward Pecos Road to the west. She testified that a photo of the poncho found later by the police was consistent with the poncho that she saw that evening. The second person was a couple of feet behind the shooter. Maldonado could not tell whether the second person was a man or a woman. The second person had what Maldonado described as long curly hair and was wearing a light colored top or tank top and a shorts-like outfit. (*Id.* at 17-18, 22-24, 27, 32-37, 41-42.) That description was not necessarily inconsistent with the description that Annette Aguilar gave of her appearance that evening. (*Id.* at 65-66.)

Maldonado heard what she perceived to be two different voices. The first asked: "Did you get him, did you get him?" Then, after some more gunshots, she heard, by a different voice: "Come out, motherf---er." She could not tell whether either voice was male or female. She just perceived that there were two different speakers. (*Id.* at 21-23, 29-33.)

---

[4]The State used aerial photographs and a diagram of the area during the testimony of the witnesses, providing a continuing context to their testimony that was apparent to the jury at trial. Those materials were not included in the federal record. In order to concisely provide similar context for the witnesses' trial testimony on federal habeas review, the Court has taken judicial notice of the respective locations of the same streets and residential addresses as reflected by an aerial view on Google Maps. *See* www.google.com/maps. The Google Maps aerial view, within the subdivision, is consistent with, collectively, the specific location testimony provided by the various witnesses in the trial record, in multiple references spread across the testimony of the respective witnesses. (*See, e.g.*, ECF No. 14-6 at 87-91.) The gas station or convenience store shown now on the southeast corner of Pecos and Washington was not present at the relevant time. (*See* ECF No. 16-20 at 91.)

As Maldonado was standing at her front gate watching with 911 on the phone, the individual in the poncho stood up and turned toward her. She went back inside, stating at trial that she did so because "I didn't want to get shot." The gunfire continued thereafter. (*Id.* at 16-17, 19-21, 37-38.)

Scrirlo Jimenez and Mark Evans shared unit No. 6 in the same six-unit building at 3525 Jungle Drive. They were next door neighbors to Terry Maldonado. Her unit was in the middle of the three units that faced south into the common area, and their unit was on the southwest corner of the building, also facing into the common area. (ECF No. 14-6 at 117-18, 124-27; ECF No. 14-7 at 25-26, 44, 48-51, 54-55.)

At approximately 11:00 p.m. that evening, Jimenez and Evans were in their respective rooms when they both heard continuing gunfire. Jimenez went to the living room window and looked out into the common area for approximately twenty seconds. He saw a man in a poncho facing away from him and to the east, in the direction where the Emersons lived at 856 Mantis Way, No. 4. Evans was more cautious and looked out for only about five seconds. Although he said in his police statement that guns were being fired in the air, he testified that he did not actually see anyone, much less anyone firing a gun, during that brief look. He thus did not see the direction in which gunfire was aimed. (ECF No. 14-6 at 118-35; ECF No. 14-7 at 44-45, 51-53, 55-57.)

Both Jimenez and Evans heard a voice saying some variation of: "Come out, motherf---er." Both testified that it was a male voice. Jimenez testified that "he" said the statement multiple times, apparently referring to the man that he saw in the poncho. (ECF No. 14-6 at 122-24; ECF No. 14-7 at 45-46.)

Mark Evans's Honda Civic was parked, unoccupied, in the parking area immediately to the west of their building. Evans and Jimenez observed afterwards that the vehicle had been struck by multiple apparent gunshots. (ECF No. 14-6 at 131-32; ECF No. 14-7 at 46-48, 52, 56-57.)

Mark Emerson lived at 856 Mantis Way, No. 4, with his wife Marla and their son and daughter. 856 Mantis Way was the furthest north of the three Mantis Way addresses

mentioned previously. The Emerson's unit was on the northwest corner of the four-unit building. The common area referenced by Maldonado, Jimenez, and Evans, who lived on the north side of the common area, was to the west of their unit. On the north side of the Emerson's unit, a sliding glass door opened from the master bedroom out onto what Marla Emerson referred to as the "back" atrium patio that opened in turn out onto the parking area on that north side of the building. (ECF No. 14-7 at 165-67, 169, 179, 188-94.)

At approximately 11:00 p.m. that evening, Marla Emerson heard very loud gunfire. She ran and pulled her children out of their beds and onto the floor to get them away from the walls. Her husband Mark grabbed a remote phone and ran out to the back atrium sliding glass door on the north side of the unit, despite her entreaties that he come back in the house. She testified that "[w]e heard another barrage of shooting, and then I heard a pop-pop-pop, and then I heard my husband scream." (ECF No. 14-7 at 167-70, 182-84, 190-91; *see also* ECF No. 14-8 at 129-32, 134-36.)

Marla Emerson ran to the sliding glass door, with her two children behind her. She saw Mark Emerson lying in the gateway to the atrium, half outside on the grass and half inside the atrium on the patio concrete. Standing three to five feet from her husband with a rifle was a man that she positively identified at trial from a photograph and also live as Gilbert Aguilar. She previously had positively identified him from the 7-Eleven surveillance video. (ECF No. 14-7 at 170-73, 181, 194-95.)

Gilbert Aguilar was pointing the rifle toward her, and he said "who's in there?" in a loud and to Emerson frightening voice. She and the children crouched down behind the curtain and crawled into the master bedroom closet. Emerson covered her children in sleeping bags and other loose items to hide them. She then crawled to what she referred to as the "jack phone" by the bed. Emerson could hear 911 on the line, but she could not talk on the line because the remote phone was turned on. (*Id.* at 173-77, 183-87, 191-93.)

Unable to speak on the jack phone, Emerson peeked around the curtain out the bedroom window to see if the man was still there. When she did not see him, she ran out

through the sliding glass door to grab the remote phone. She stopped briefly and comforted her husband, who was still alive. Emerson then ran back inside behind the curtain, screaming for help from 911 dispatch, who still was on the line. (*Id.* at 175-78.)

Marla Emerson then saw red flashing lights from police vehicles coming from outside. The shooting had stopped by that time. She looked out again to make sure that the man was not outside; and she ran back to the gate again screaming and waving officers down. Officers came to their aid, and thereafter emergency medical personnel. Mark Emerson passed away a short time later. (*Id.* at 178, 187-88.)

At trial, Emerson pointed out a yellow Volkswagen parked close to her unit from a crime scene photograph. (*Id.* at 178-80; *see also* ECF No. 14-9 at 95-96.)

During the gunfire, Annette Aguilar testified that she had remained crouched down behind the yellow Volkswagen. Gilbert Aguilar eventually called for her, however; and she walked over to where he was. The shooting continued. Annette later heard Gilbert curse and say that his gun was jammed. (ECF No. 14-7 at 74-77, 112-13.)

Thereafter, the nearsighted Annette Aguilar saw a light. She thought at the time that it was the spotlight from a police car, but the only thing of which she was certain at trial was that she saw a bright light. She became frightened of being shot by the police, and she ran back to Gloria Olivares's unit at 840 Mantis Way. David Aguilar passed her on the way back, however; and he already was inside when she reached the closed door. (*Id.* at 75-79, 110-12, 128-29, 132-33, 137-38.)

Annette Aguilar heard gunfire while she was running back to Olivares' unit. She heard more gunfire after she arrived back at the unit. She did not hear anyone screaming at any point. (*Id.* at 78-80, 126.)

Patrol Officers Brian Wise and Chad Brown of the Las Vegas Metropolitan Police Department ("Metro") were responding to a nonemergency call at approximately 11:00 p.m. when they heard the gunfire start. They were only a short distance away off to the northeast. They began driving to the south and then west in the general direction of the

///

gunfire, with Officer Wise ultimately in the lead in his marked police vehicle and Brown following in his. (ECF No. 14-8 at 39-42, 48-51, 57, 80-84, 103-04.)

As they were nearing Pecos westbound on Washington, dispatch informed Officer Wise of 911 calls coming from Mantis Way. He also had seen people popping up above walls pointing to the gunfire, and that direction was consistent with where he and Officer Brown were hearing continuing gunfire. Officer Wise U-turned on Washington to head back toward Mantis Way only a short distance down the street, and Officer Brown did the same and followed Wise back east. At approximately this point in time, the officers put their vehicles in "blacked out," "dark," or "tactical" mode—with no flashing warning lights, sirens, or headlights on—so as to not make the officers a target. Neither officer was unequivocally certain at trial that they turned off their respective headlights specifically prior to making their U-turns north of the subdivision on Washington. (*Id.* at 42-43, 49-50, 52-57, 65-66, 71-72, 84-86, 95-96, 104-07, 109, 121.)

As Officer Wise approached the intersection at Mantis Way, he believed that his vehicle was taking fire. He aborted the turn onto Mantis Way, crouched down in his vehicle to avoid gunfire, and brought his vehicle to a stop a distance to the east of the intersection. Officer Brown heard Wise's call that he was "taking rounds," and he thereafter perceived that gunfire also was hitting near or on his vehicle. He similarly crouched down in the vehicle; but he was unable to stop his turn into the intersection, coming to a stop approximately in the intersection of Mantis and Washington. Brown rolled out of the vehicle and tried to find cover. (*Id.* at 43-44, 51, 56-59, 66-70, 86-87, 96-98, 100-01, 107-11, 118-19, 121-24.)

Officer Brown thus ended up entering the subdivision on foot first, separated from Officer Wise. Brown went down the eastern side of Mantis Way, *i.e.*, on the opposite side of the street from where 856, 848, and 840 Mantis Way were to the south of his position. He made his way down the street using available cover. (*Id.* at 88.)

When he was about forty to fifty feet down Mantis, Officer Brown heard loud screaming, and he saw a man firing what he then perceived to be a shotgun in a westerly

direction. (*Id.* at 88-89, 111, 113-14, 119.) Brown took cover partially behind an electrical utility box on the east side of Mantis. (*Id.* at 88, 97-98, 112, 124-25.) Brown estimated that the man was a little over forty yards to the south of him on the west side of Mantis. He was standing in a location that the officer described at trial as "on the southwest corner of a little side street." (*Id.* at 88, 98, 111.) Multiple ejected empty cartridge casings later were recovered from the southeast corner of the parking lot on the west side of the street and on the north side of 856 Mantis Way. (ECF No. 14-9 at 66-69.)[5] No ejected casings were recovered from any location along the west side of Mantis further to either the south or north of that location, including to the north at the intersection of Jungle Drive and Mantis. Officer Brown thus appears, in the context of the overall trial evidence, to have been referring to the man having been standing at the southwest corner of the entrance to the parking area that was immediately north of 856 Mantis Way. That would put the man near the northeast corner of that building, to the east of the "back" atrium entrance to the Emersons' unit near the middle of the north side of that building.

After taking cover behind the electrical box, Officer Brown drew his service semiautomatic 9 mm pistol and then told the man a variation of: "Drop the gun, drop the gun" or "Put down your gun, put down the gun." Brown perceived that the man turned toward his voice and fired now at him. Officer Brown fired four shots, and he perceived that the man fired another shot at him. (ECF No. 14-8 at 89-90, 93-95, 98, 112-17.)

The man then turned and ran southbound down the sidewalk on Mantis, on the west side of the street, with Officer Brown trailing him on the east side of the street using available cover. Brown was able to track him down the street, but he lost sight of the man when he turned the corner in the darkness and slipped into one of the units at 840 Mantis Way, which was where Gloria Olivares's unit was. Brown stationed himself to observe the

---

[5]A "cartridge" refers to a single unfired round of ammunition consisting of a "bullet" or "projectile" seated into a "cartridge casing," "casing" or "case" that contains the propellant and primer. An unfired cartridge also is referred to as a "live" cartridge. (*See, e.g.*, ECF No. 14-10 at 53, 57-58.) On a semiautomatic gun, the empty casing is ejected from an ejection port by the action of the weapon when firing the bullet.

area in case the man reappeared, but he did not see him again prior to being relieved by other responding officers. (*Id.* at 90-91, 98-99, 115-18.)[6]

Officer Brown initially described the shooter that he observed late that evening as a heavyset white male with a bald head in a black tank top. That description was generally consistent with a photograph of Gilbert Aguilar's appearance at the time and with descriptions by Annette Aguilar and Joyce Brown of his clothing and appearance that evening, with the principal exception that Aguilar was Hispanic rather than white. After David Aguilar was apprehended later that evening, he was presented to Brown by other officers for possible identification. Officer Brown indicated that he was not the shooter that he observed. Brown later viewed a portion of the surveillance video from the 7-Eleven from the time that the Aguilar brothers were in the store. Officer Brown identified Gilbert Aguilar from the videotape as the shooter that he had observed. He was "absolutely" certain in his identification. (ECF No. 14-6 at 71-76; ECF No. 14-7 at 62-63, 83-87; ECF No. 14-8 at 88-89, 91-93, 99-100, 120-21.)

After the gunfire had started that evening, Gloria Olivares's next-door neighbor, Joyce Brown, had laid down on her floor, fearing that bullets might come through her window. Later, she got up from the floor to answer a phone call from her son, who lived in the same subdivision. After speaking with her son, she heard footsteps running across her yard from the area of Washington toward Olivares' unit. Thereafter, she heard someone say: "Put your gun down, put your gun down." She looked out her living room window, which faced onto Mantis Way. She saw Gilbert Aguilar, wearing a black tank top as he had earlier in the evening, running across her yard. She also saw a police officer. A short time later, "Mantis Way was full of policemen;" and she did not see Gilbert Aguilar again. (ECF No. 14-6 at 80-85, 90-91, 95-97, 112-13, 115-16.)

///

---

[6]Officer Wise had trailed Officer Brown down Mantis, trying to locate and assist him. At some point, Wise crossed over to the west side of the street; and he was the first or one of the first officers to reach Mark Emerson. As other officers appeared, he continued on looking for Brown, until both were relieved separately by other responding officers. (ECF No. 14-8 at 45-48, 50, 53-54, 59-65, 70-74.)

Arlene Nelson lived in the same building as Gloria Olivares, at 840 Mantis Way, No. 4. Her unit was the middle unit on the north side of the building, immediately next door to the west of Olivares's unit and opening out onto the walkway between 840 and 848 Mantis Way. After the gunfire started at approximately 11:00 p.m., she called 911. She later heard footsteps running by followed by loud knocking on the door of Olivares's unit next door. (ECF No. 14-7 at 154-61.)

Annette Aguilar testified that Gilbert Aguilar arrived back at Olivares's unit shortly after she did. He gave his gun to David Aguilar. Annette Aguilar saw both guns back at Olivares's residence after all three had returned to the unit. Gilbert Aguilar changed his pants. The Aguilar brothers, Annette, Gloria Olivares, and her daughter then all left the unit together. They left the guns behind. (*Id.* at 79-82, 87, 129-30.)

Collectively, the testimony of Officer Brown, Joyce Brown, Arlene Nelson, and Annette Aguilar thus tended to establish that, after the exchange or possible exchange of gunfire with Officer Brown, Gilbert Aguilar proceeded directly south on Mantis Way until he was back inside the Olivares residence. The testimony therefore tended to establish that Marla Emerson saw Gilbert Aguilar standing with a rifle near her mortally wounded husband necessarily prior to Aguilar's exchange or possible exchange of gunfire with Officer Brown. That is, after being seen and fired upon by Officer Brown, Gilbert Aguilar ran directly south to the Olivares residence, not west toward the Emerson residence.

Annette Aguilar testified that after they left Olivares' unit, they hopped the fence into the development's pool area. They then jumped into the pool still wearing their street clothes. They subsequently left the pool area, and Annette and Gilbert thereafter split off from the rest and hid in an unoccupied unit for several days. Annette and Gilbert were apprehended nine days later. (*Id.* at 87-91, 95-96, 112, 130.)[7]

---

[7]Gregorio Urriola testified that he was near the pool area after the shooting had stopped when he heard the sound of five or six people running by the pool area, a sound like someone was throwing something in the bushes between the pool and the tennis court, and then the sound of people going over the fence into the pool area. Thereafter, he saw the Aguilar brothers with three or four females in the pool area. One of the brothers

David Aguilar was apprehended later the same evening as the shooting. When Aguilar was apprehended, he and Gloria Olivares were in wet casual clothes; and Aguilar was not wearing a shirt. The investigating officer noted that Aguilar had marks on him consistent with running and jumping over fences as well as bruising on his shoulder consistent, in that officer's view, with the effect of rifle recoil. After David Aguilar initially was detained in handcuffs, a 9 mm cartridge apparently fell from one of his pockets at his feet. The 9 mm round was not of the same type as that used by Metro patrol officers, as it was a basic ball round rather than a hollow-point round. A search of Aguilar's person then further led to the recovery of a live 7.62 mm cartridge in a pocket. (ECF No. 14-9 at 23-32, 43-47; *see also id.* at 49-52, 56-59, 103-05.)

During their subsequent investigation, the police recovered six live 7.62 mm cartridges in or near the bushes by the tennis court near the pool. The police also recovered a dark tank top from the bushes approximately two doors away from Gloria Olivares's residence corresponding to the one that Gilbert Aguilar had worn that evening. (*Id.* at 73, 80-81, 88-89, 101-03, 113-14, 137.)

When the police searched Gloria Olivares's residence, they found: (1) the B-West AK-47 in a utility closet or laundry room near a thirty-round-capacity magazine loaded with twelve 7.62 mm cartridges; (2) in the same utility closet, a stripper clip used for fast loading of a magazine which had an additional ten such cartridges; (3) the Maadi AK-47 on a sofa near a black-and-white poncho, with a thirty-round-capacity magazine inserted in the rifle that was loaded with thirteen 7.62 mm cartridges and another single 7.62 mm cartridge nearby; and (4) Gilbert Aguilar's pants in a bathroom with his wallet, his

///

---

entreated Urriola through the fence to also come into the pool area, but he declined. The Aguilars essentially did not respond when he asked them whether they had heard the gunfire. Later that evening, the police were questioning people in the neighborhood. Gilbert Aguilar was not with David Aguilar and the others by this time. One of the females with David Aguilar indicated that Urriola would back their story that they were in the pool during the shooting; and Aguilar eyed Urriola while he was being questioned. Urriola did not corroborate their story, however; and Aguilar was arrested at approximately that time. (ECF No. 14-8 at 137-52.)

identification, and twenty-three live 7.62 mm cartridges in a pants pocket. (ECF No. 14-9 at 74-80, 106-07, 109-12, 114-16, 122, 136-38, 143.)

Investigators further recovered over forty ejected 7.62 mm casings along with two live 7.62 mm cartridges in and around the parking area and common area to the north and west respectively of 856 Mantis Way. The ejected casings were identified as falling respectively into one of three categories. First, a number of the casings were ejected from the Maadi AK-47, to the exclusion of all other weapons. Second, other casings were ejected from the B-West AK-47, to the exclusion of all other weapons. Third, the remaining six casings, which were recovered from the same general area with the other casings, were ejected from a B-West AK-47, including possibly the B-West AK-47 recovered from Olivares's residence, and no other type of weapon. The additional recovery of two live 7.62 mm cartridges near other ejected 7.62 mm casings was consistent with a jammed weapon being cleared, although the presence of the live cartridges could be explained by other circumstances as well. A premise that the two live cartridges were expended when the B-West AK-47 was cleared of a jam was consistent with Annette Aguilar's testimony that Gilbert Aguilar stated that his weapon was jammed at one point during the barrage. (*Id.* at 66-70, 85-87, 95-100, 108-09, 122-23; ECF No. 14-10 at 68-70, 72-73, 75-80, 86, 100-02, 109-11.)

Four expended 9 mm casings further were recovered from the general area by the electric utility box where Officer Brown testified that he discharged his service weapon. The four casings all were ejected from Officer Brown's weapon to the exclusion of all other weapons. (ECF No. 14-9 at 65, 88, 93-94, 108-09, 129-30; ECF No. 14-10 at 67.)

The trial record does not reflect that any other expended casings—whether for any other different particular weapons or for any other different caliber weapons—were recovered during the police investigation.

The medical examiner testified that Mark Emerson was killed by a single gunshot wound that entered low on his left chest and exited his back. Given that the single, mortal ///

wound was a through-and-through wound, no projectile was recovered from his body during the autopsy. (ECF No. 14-10 at 40-51.)[8]

Two projectiles were recovered from the entrance to the Emersons' unit in 856 Mantis Way, where Mark Emerson was standing when he was fatally shot, with one bullet being recovered from each side of the entrance. Those two bullets were fired from the B-West AK-47. (ECF No. 14-9 at 71-72, 96-98, 108-09, 113-14, 129-30; ECF No. 14-10 at 70-71, 96-97.)

Two projectiles were recovered from the "extreme east end in the north wall of" 856 Mantis Way, at approximately two feet high and one foot, one inch high. (ECF No. 14-9 at 72.) This location would correspond to the area where Officer Brown testified that the shooter was standing when he fired his weapon. These two bullets were fired from Officer Brown's 9 mm service pistol. (*Id.* at 66-67, 105-06.)

A projectile fragment, the exterior metal jacketing from a bullet, was recovered by Tim Bradford from inside his kitchen cabinet at his Valley Forge address across Washington and turned over to a crime scene analyst. The projectile associated with this jacketing was fired from the B-West AK-47. There also was a possible bullet hole to the west or left of the sliding glass door. The analyst did not attempt to retrieve any bullet associated with the possible bullet hole because extensive destructive measures would have been required to do so. (*Id.* at 5-16, 81, 108, 121-22, 126; ECF No. 14-10 at 74-75, 100.)

Another projectile fragment, a portion of the jacketing from a round, was recovered in a gutter near a vehicle in a parking area on the west side of Mantis Way close to the intersection of Mantis and Washington. That direction was generally near where the first responding officers attempted to enter the subdivision in their vehicles before abandoning

---

[8]The Court notes in passing that the firearms expert testified that the muzzle velocity of an AK-47-type rifle round would be in the range of approximately 2200 to 2700 feet per second in comparison to approximately 1000 to 1200 feet per second for a 9 mm pistol. The muzzle velocity for a round fired from the AK-47-type rifles thus was approximately twice as much as that for a round fired from the officer's 9 mm pistol. (ECF No. 14-10 at 80.) The trial testimony further reflected that Metro patrol officers used hollow point ammunition. (*See supra* at 14.)

the vehicles and coming down Mantis separately on foot. The projectile associated with this fragment was fired from the B-West AK-47. (ECF No. 14-9 at 65-66, 95, 124-25, 131; ECF No. 14-10 at 72, 97-98, 107.)

Lastly, another projectile fragment was recovered from Officer Brown's patrol vehicle. The projectile initially penetrated the plastic brand lettering on the grill, struck the hood latch mechanism, and dropped down onto a brace or support for the radiator. The recovered fragment was only a portion of the metal core of the bullet without the exterior metal jacketing. The firearms expert therefore was not able to match the fragment to any specific weapon. (ECF No. 14-10 at 19-35, 83-84, 94-96, 110.)

No other fired bullets were recovered other than the four projectiles that were fired from the B-West AK-47, the two bullets fired by Officer Brown, and the one bullet core fragment recovered from Officer Brown's vehicle that could not be attributed to a particular weapon. (*Id.* at 104-06, 110.) Thus, no identifiable fired bullets were recovered that were fired from any weapon other than the B-West rifle and Brown's service pistol. The four recovered bullets that were fired from the B-West AK-47 included the two rifle bullets recovered from the entranceway where Mark Emerson was standing when he was shot and killed by a through-and-through wound.

On August 9, 1996, a day and a half after the incident, police recovered a single live .223 caliber cartridge from under the bushes by the tennis court. No fingerprints could be recovered from the unfired cartridge. (ECF No. 14-7 at 197-201.) No expended .223 caliber casings, and no fired projectiles identified as .223 caliber projectiles were recovered at any time during the investigation reflected by the trial evidence, including from the area where Mark Emerson was killed well to the north of the tennis court.[9]

///

///

_____

[9]Investigators also observed multiple apparent bullet holes or strikes in Mark Evans's Honda Civic. No fired projectiles were recovered from that vehicle. (ECF No. 14-9 at 70-71, 100-101, 132-35, 140-45.) The brothers were acquitted of the charge of discharging a firearm into the Evans vehicle, which was not occupied at the time of the shooting.

The evidence at trial did not reflect that any individual other than Gilbert Aguilar and David Aguilar possessed and/or fired the B-West AK-47 or the Maadi AK-47 at any time that evening, including specifically when Mark Emerson was killed.

The evidence at trial did not reflect that any individual was seen with a rifle or firing a rifle who was not either consistent with the description of the poncho-wearing David Aguilar or identified by the witness as Gilbert Aguilar. Officer Brown did initially describe the shooter that he saw in the dark as, *inter alia*, a white male; but he subsequently positively identified the shooter as Gilbert Aguilar after reviewing a portion of the 7-Eleven surveillance video. (*See supra* at 12.)

The Aguilar brothers were tried as principals, coconspirators, and aiders and abettors, such that if one brother foreseeably pulled the trigger the other also was culpable. Accordingly, under the State's theory of the case, David Aguilar was culpable as a coconspirator and/or aider and abettor for, *inter alia*, a murder committed by Gilbert Aguilar. (*E.g.*, ECF No. 14-11 at 21-25.)

David Aguilar was convicted specifically of conspiracy to commit murder, the first-degree murder of Mark Emerson with the use of a deadly weapon, discharging a firearm at or into a structure consisting of the Emerson dwelling, discharging a firearm at or into a structure consisting of the Bradford dwelling, and discharging a firearm at or into a vehicle consisting of Officer Brown's vehicle. He was acquitted of attempted murder of Officer Brown with a deadly weapon, discharging a firearm at or into a vehicle consisting of Mark Evans's Honda Civic, and assault with the use of a deadly weapon as to Officer Wise. (*Compare* ECF No. 13-4 *with* ECF No. 14-15.)

Aguilar challenged the judgment of conviction on both direct appeal and state post-conviction review. He ultimately was represented by counsel in the state post-conviction proceedings, and an evidentiary hearing was held with counsel.

## II.  GOVERNING LAW

When the state courts have adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a "highly deferential" standard for

evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. 563 U.S. at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 563 U.S. at 181-88.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g.*, *Esparza*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of section 2254(d)(2) controls on federal

habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference to the state court factual finding:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

On Petitioner's claims of ineffective assistance of counsel, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g.*, *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). On the performance prong in particular, "[e]ven under a *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Accordingly,

> *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S., at 689–690, 104 S. Ct. 2052.

20

The [reviewing court is] required not simply to "give [the] attorneys the benefit of the doubt," . . . but to affirmatively entertain the range of possible "reasons [defense] counsel may have had for proceeding as they did," . . . (Kozinski, C.J., dissenting). *See also Richter*, *supra*, . . . ("*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

*Pinholster*, 563 U.S. at 196; *see also Richter*, 562 U.S. at 109-10.

When the deferential review of counsel's representation under *Strickland* is coupled with the deferential standard of review of a state court decision under AEDPA, *Richter* instructs that such review is "doubly" deferential:

The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 569.

## III. DISCUSSION

### A. Ground 5: Alleged Theft of the B-West AK-47 from a Police Officer

In the first remaining ground, Ground 5, Aguilar alleges that he was denied effective assistance when counsel failed to: (a) present evidence that allegedly the B-West AK-47 had been stolen from a police officer; and (b) investigate the officer's involvement allegedly indicated by his AK-47 being connected to the murder and his alleged failure to report the theft prior to the murder. (ECF No. 28 at 17-19.)

The prior summary of the guilt-phase evidence discusses the roles played respectively by the B-West AK-47 and the Maadi AK-47 in the offenses of which David Aguilar was convicted. The State maintained that Mark Emerson likely was shot and killed with the B-West AK-47 rather than the Maadi AK-47. (*See supra* at 1-18.) Petitioner maintains, *inter alia*, that counsel was ineffective for failing to establish at trial that the murder weapon, the B-West AK-47, had been stolen from a police officer.

During the penalty phase, Metro Detective Michael Franks testified that the Bureau of Alcohol, Tobacco and Firearms ("ATF") was able to trace the ownership of one of the

two rifles, referring to the B-West AK-47 and the Maadi AK-47. ATF was able to trace one weapon back to an Officer Debecker. When asked which weapon, he responded: "I believe it was the Egyptian Maadi." (ECF No. 14-20 at 94-95.)

Metro Officer Brian Debecker testified also during the penalty phase, *inter alia,* that (1) he discovered on January 1, 1995, that, *inter alia*, three firearms, including an "AK-47 assault rifle," had been stolen from his residence while he was at work; (2) he had purchased the AK-47 from another officer, Kevin Stevens, approximately two years before the burglary; and (3) subsequent to the burglary, he received a call advising him that the AK-47 had been "used in the commission of a murder as well as being fired at police officers," referring to the incidents in this case. (ECF No. 14-18 at 85-89.)

No direct evidence was presented during the penalty phase that the B-West AK-47 that the State maintained killed Mark Emerson was stolen from Officer Debecker. The evidence presented at that time in October 1997 instead tended to reflect that it was the Maadi AK-47 that had been stolen from Debecker.

Penalty-phase evidence further reflected that Gilbert Aguilar previously had been charged with federal firearms violations involving forty Norinco MAK-90 AK-47 Sportsters and nine other Norinco AK-47-type rifles. Aguilar was convicted of the charge regarding the nine rifles, but he was acquitted of the charge involving the forty rifles. The forty AK-47-type rifles were never recovered by federal authorities. The testifying ATF agent clarified that B-West was not a manufacturer but instead was an importer, with Norinco being a manufacturer. (*Id.* at 116-19, 122, 125-26.)[10]

In March of 1984, Gilbert Aguilar, David Aguilar, and another accomplice were arrested for burglarizing a gun store in Arizona and stealing thirty-nine weapons, including rifles, shotguns, and pistols with a total value of over $12,000. Twenty-four of the weapons were recovered from Gilbert Aguilar's residence. At least David Aguilar was convicted for

---

[10]The Court notes that, with respect to the penalty-phase evidence surveyed herein, any door that would have been opened to the admission of similar evidence in the guilt phase as to Gilbert Aguilar also would impact David Aguilar given that the State alleged that they were jointly culpable as coconspirators and aiders and abettors.

the offense, which occurred while he was on probation from a prior offense involving assault with a deadly weapon. (*Id.* at 59-61, 133-34; *see also* ECF No. 14-21 at 91-93, 99.)

The State further produced evidence reflecting multiple prior violent offenses by David Aguilar and Gilbert Aguilar, frequently involving weapons generally and firearms in particular.

The State presented evidence that Gilbert Aguilar, *inter alia*, had been convicted of aggravated assault-related offenses after he fired several shots from a shotgun at a crowd of people standing on a corner, with Aguilar thereafter attempting to flee—shotgun in hand—when the vehicle in which he was riding was pulled over by the police. (ECF No. 14-18 at 132-33; *see also id.* at 89-106, 134-37.)

The State presented evidence that David Aguilar, *inter alia*: (1) had been convicted of ex-felon in possession of a firearm following an incident—only five months prior to the August 1996 offenses—where Aguilar was firing an SKS-type rifle with a large capacity magazine in the same Atrium Gardens subdivision, with Aguilar purportedly believing that someone was shooting at him and telling arresting officers that he had a constitutional right to bear arms (*Id.* at 77-85);[11] and (2) had pled guilty in 1982 to aggravated assault with a deadly weapon following a gang conflict where he fired multiple shots with a handgun at rival gang members, claiming that he meant only to scare them, in a situation where multiple innocent bystanders were present at a baseball game in a park (*Id.* at 50-59, 61-63). (*See also id.* at 67-76; ECF No. 14-20 at 85-87; ECF No. 14-21 at 71-77, 84-91, 95-96.)

Following the penalty phase, Gilbert Aguilar was sentenced for the murder of Mark Emerson to consecutive life sentences without the possibility of parole; and David Aguilar was sentenced for that offense to consecutive sentences of life with the possibility of ///

---

[11]The Court carries forward the more generic "SKS-type" reference to the rifle in the state court record.

parole. Both brothers thus avoided imposition of the death penalty. (ECF Nos. 14-24, 14-31, 15.)

The Aguilar brothers thereafter sought post-conviction relief following the conclusion of direct review. David Aguilar alleged in his *pro se* petition that trial counsel had been ineffective for failing to investigate Officer Debecker's alleged involvement in the offenses by virtue of the fact that the Maadi AK-47—not the B-West AK-47—had been stolen from the officer. He did allege further, however, without supporting evidence, that Officer Debecker fired the shot that killed Mark Emerson. (*E.g.*, ECF No. 15-12 at 68-70, 72-73.)

The state district court initially held a joint evidentiary hearing on the Aguilar brothers' petitions, without appointing counsel. The state supreme court reversed and remanded, however, for the appointment of counsel. (ECF Nos. 16, 16-1, 16-2, 16-3, 16-7, 16-8, 16-10.)

The matter came on for a joint evidentiary hearing, with separate counsel for each brother, first on June 25, 2010, and thereafter on December 3, 2010. (ECF Nos. 16-19, 16-20.) The counseled evidentiary hearing therefore was held approximately thirteen years after the October 1997 trial.

During the hearing, a criminal defense investigator retained for David Aguilar testified that he subpoenaed records regarding Officer Debecker in December 2009. He was unable to obtain any such records in response to the subpoena. The investigator thus was unable to determine: (1) when Officer Debecker's AK-47 was reported stolen; and (2) where Officer Debecker was approximately a dozen years earlier on the evening of August 7, 1996. The investigator presented no evidence of any relationship between Officer Debecker and anyone involved in the case or any involvement by Debecker with the case. (ECF No. 16-19 at 19-22, 27-31.)

No competent independent evidence was presented at the evidentiary hearing establishing that the rifle stolen from Officer Debecker was the B-West AK-47 that the trial evidence tended to establish was used to kill Mark Emerson. The only competent

evidence in the state court record as a whole tended to establish that the rifle stolen from Debecker instead was the Maadi AK-47. (*See supra* at 21-22.)

No competent, independent evidence was presented at the evidentiary hearing establishing that Officer Debecker did not report his AK-47 stolen until after the August 7, 1996 murder of Mark Emerson.

As noted above, the defense investigator retained for Aguilar testified at the hearing that he was unable to determine when Officer Debecker reported that the AK-47 was stolen. Nevertheless, state post-conviction counsel asserted: "It was reported stolen by Officer Debecker after the crime took place" during his examination of Petitioner's lead trial counsel. (ECF No. 16-19 at 59.) Given that state post-conviction counsel's statement did not constitute evidence, the only actual evidence that Petitioner presented showed that Petitioner could not establish when the weapon was stolen. Post-conviction counsel's statement that the theft was reported only after the murder thus was not supported by the only actual evidence presented at the hearing on that point.

Moreover, none of the four trial lawyers for the two defendants recalled specifically, thirteen years after the trial, when Officer Debecker reported his AK-47 stolen.

Roger Hillman, lead trial counsel for David Aguilar, stated at the outset of his testimony regarding his general recollection of the case: "It's been 13 years. I don't remember a lot of it." (*Id.* at 33.) A copy of the original defense file sent to Aguilar had not been retained by his office. (*Id.* at 73-74.) Thus, Hillman was unable to remember much about the case. (*See id.* at 33-120.)

With particular regard to Officer Debecker's weapon, the following exchange occurred during Hillman's testimony:

Q.    I would like to turn now to Office Debecker.

    Did you become aware prior to the trial of any special circumstances involving one of the AK-47s allegedly used during the crime?

A.    Yeah. I don't remember if it was the SKS [counsel likely confuses the stolen AK-47 with the SKS fired by David Aguilar five months before the murder] or the Moddi [sic], but it was reported stolen from that officer a year or a year and a half before.

| | |
|---|---|
| Q. | That it was stolen or that it was missing? |
| A. | My recollection is stolen, but I don't know if it was missing. It seems to me that it was stolen. |
| Q. | Do you recall at what point it was reported stolen? |
| A. | Later on, *if I remember right*. It *seemed like* there was some reason why he reported it stolen later instead of immediately at the time. |
| Q. | Do you recall it being reported stolen after the murder took place? |
| A. | That's *possible. I don't remember specifically*. |

(*Id.* at 57-58 (emphasis added).)[12]

The remaining testimony by Hillman as well as the testimony of the other three defense lawyers respectively representing the two brothers similarly failed to establish that Officer Debecker did not report his AK-47 stolen until after the murder. Lead counsel for Gilbert Aguilar, William Wolfbrandt, Jr., testified initially that "[a] report had been generated at the time" of the theft. On further questioning, however, he indicated that he could not state the specific dates that the report was generated or when he saw it. Neither second chair testified to any specific recollection on the point. (*See id.* at 66, 136-39; ECF No. 16-20 at 12-13, 23, 106, 116.)

Furthermore, no competent independent evidence was presented at the evidentiary hearing establishing that Officer Debecker otherwise was involved—in any respect—in the August 7, 1996 murder. The only actual historical facts presented or tendered to any court to date are that: (1) Officer Debecker's Maadi AK-47 was stolen on or before January 1, 1995; and (2) the Maadi AK-47 was recovered from Gloria Olivares's residence with David Aguilar's palm print on it after the August 7, 1996 shooting spree

---

[12]Petitioner relies upon this particular passage as evidence that Officer Debecker did not report that his AK-47 was stolen until after the murder. (ECF No. 28 at 18; ECF No. 68 at 5.) A witness's response that something was "possible" but that he did not remember specifically whether or not the alleged fact was true does not establish any fact. On both state and federal post-conviction review, a petitioner has the burden of proving facts by a preponderance of the evidence. If witnesses no longer recall whether or not a specific fact is true, then the petitioner simply has failed to carry his burden of proof. In this instance, Aguilar attempted to develop evidence of when Debecker reported his rifle stolen via a subpoena request, but he was unable to do so. The equivocal testimony of an attorney with no remaining file and scant recollection thirteen years after the fact did not fill in the gap in Petitioner's evidence.

where the trial evidence tended to establish that the Aguilar brothers collectively had been firing that rifle and the B-West AK-47 during the incident. (*E.g.,* ECF No. 16-20 at 21, 23; *see also* ECF No. 14-21 at 104.)

The evidentiary hearing record tended to establish that defense counsel for the two Aguilar brothers, who were cooperating in the defense of the case, were aware prior to trial that one of the AK-47s had been stolen from Officer Debecker. John Shook, second chair for Gilbert Aguilar, noted in a July 12, 1997 letter report: "Brian Debecker—Reported AK-47 used in crime stolen in 1994." (ECF No. 15-17 at 39; ECF No. 16-20 at 12-14, 16, 18-21, 39, 43.) David Aguilar's lead counsel Hillman further testified that he thought that he was aware of that particular fact prior to trial. (ECF No. 16-19 at 58.)

Hillman testified that he knew he talked to his investigator about investigating whether Officer Debecker was present at the scene of the crime on August 7, 1996. He testified that "the best recollection I have is that he followed up on that and didn't find anything useful for us." He had no further recollection as to the specifics of the investigation. (*Id.* at 60-61; *see also id.* at 66, 95, 111; ECF 16-20 at 115.)

Hillman testified as follows as to why he did not rely upon the fact that one of the weapons was stolen from Officer Debecker in defending Aguilar at trial:

> Q.    And why did you not do that?
>
> A.    Because it would have opened a door as to an alternate theory, which is that David and/or Gilbert or someone known to them stole the officer—or stole the weapon from Officer Debecker, and that would have opened the door to David's involvement in those type of weapons in the past in Arizona.
>
>      If I remember right, David or David's brother-in-law was involved with the movement of several SKS and Moddi, M-O-D-D-I, [sic] AK-47-type weapons down in Arizona before.

(ECF No. 16-19 at 62; *see also id.* at 63-64, 95-96.)

Hillman elaborated further, after his recollection was refreshed from the presentence investigation report as to prior weapons-related offenses:

> Q.    What sort of door do you think would have been opened had you pursued this business about an actual member of the Las Vegas Metropolitan Police Department being a murderer here?

A.    I think that that would have appeared very unreasonable and very paranoid to the jurors. It would have opened the door, again, as to David's involvement and knowledge of assault rifles, which I needed education on that, even though I had been an attorney for ten years at the time and handled murder cases involving firearms.

It also would have raised the issue again of whether David or Gilbert had been involved in the theft of that firearm, if the jury didn't believe that Debecker had committed the crime and planted it.

It also would have caused speculation as to how, if the jurors did not believe that Debecker planted that firearm in Gloria's apartment, how did David and/or Gilbert get ahold of that weapon. Did they steal it? Did they buy it? Were they trafficking in stolen assault rifles?

Q.    Would it be reasonable to assume that the prosecution, had that been your defense, would have pursued a bad acts motion and attempted to introduce evidence of the defendant's prior from Arizona related to this issue?

A.    Undoubtedly.

Q.    Based upon your experience as an attorney, would there have been a reasonable chance that such a motion would have been granted?

A.    I think it would have been granted.

Q.    And how do you think the defendant would have fared had that been granted?

A.    It would have diminished our chances in the guilt phase and the penalty phase for a good result.

(*Id.* at 97-98; *see also id.* at 110-11.)

Hillman discussed the potential impact upon the penalty phase further when testifying about David Aguilar's related claim of a general government conspiracy against him. Hillman noted that, because the case was a capital case, the defense had to be concerned also with how a guilt-phase defense might impact the penalty phase. Avoiding possible imposition of the death penalty was a major goal in defending the case, and Hillman regarded the evidence of guilt in the Aguilar case to be "very strong." He therefore sought to avoid marginal defenses that both might impair the credibility of the defense and might cast Aguilar in an unsympathetic light even before the case possibly reached the penalty phase. (*Id.* at 78-80; *see also* ECF No. 16-20 at 20-21.)

///

Hillman explained further:

> A. And you have to decide if—if what you're going to present to a jury
> is something that a jury will believe or not. I felt that the jury would
> not believe this [referring to Aguilar's government conspiracy theory].
> And that David would come off as being somewhat paranoid, if not
> delusional, to them.
>
> Coupled with the weapons that were involved in Mr. Aguilar's past, I
> was concerned that the jury would have fear of Mr. Aguilar and might
> base their decision upon that emotional response rather than the
> evidence in the court.
>
> . . . . .
>
> A. And that is something we thought about and something we styled our
> defense in the penalty hearing for—excuse me—the guilt phase as
> well. We did not want to present David as someone who was—
> someone that would frighten the jurors.

(ECF No. 16-19 at 78-79; *see also id.* at 137-38.)

The state district court found, *inter alia*, as follows:

> Counsel cannot be deemed ineffective for deciding against presenting a
> theory that Officer Brian Debecker was the shooter because: (1) there was
> no evidence to support this theory, which would have appeared
> unreasonable and paranoid to jurors; (2) there was no evidence that Officer
> Debecker was anywhere near the 7-Eleven on the night in question; and (3)
> raising the issue would have allowed for the introduction of Defendants'
> prior crimes, including possession of stolen firearms similar to those used
> in the shooting. . . . . Moreover, there was no evidence to determine that the
> fatal bullet striking Mr. Emerson was fired by Officer Debecker's stolen AK-
> 47. . . . . Based on well-supported strategic reasons, counsel for both
> Defendants determined in advance of trial not to put forth this theory.

(ECF No. 16-24 at 12-13.)

The state supreme court rejected the claims on the following basis:

> [A]ppellants claim that trial counsel were ineffective for failing to investigate
> and present evidence that the weapon used to kill the victim belonged to a
> police officer and that the police officer may have fired the fatal shot.
> Appellants fail to demonstrate that trial counsel were deficient. Trial counsel
> testified at the evidentiary hearing that there was a tactical reason for not
> presenting this evidence: one of the appellants had prior convictions or
> arrests for dealing in stolen weapons. Trial counsel made a tactical decision
> that they not want the jury to hear that evidence and make a connection that
> appellants stole the guns used in the crime. Therefore, the district court did
> not err in denying this claim.

(ECF No. 16-36 at 3.)

///

The state supreme court's rejection of the claims presented in Ground 5 was neither contrary to nor an unreasonable application of the clearly established federal law in *Strickland* and following cases.

At the outset, Petitioner's principal factual allegations in Ground 5 are not supported by competent evidence in the record that was before the state courts when they rejected the claims on the merits. Petitioner urges that the weapon stolen from Officer Debecker was the B-West AK-47 that the State postulated was the likely murder weapon. However, the only available evidence in the state court record tends to establish that the weapon stolen from Debecker instead was the Maadi AK-47. (*See supra* at 21-22, 24-25.) Petitioner further urges that Officer Debecker did not report that his AK-47 was stolen until after the murder. There was no independent competent evidence in the state court record establishing such a fact. (See *supra* at 24-25.) Finally, Petitioner refers multiple times to Officer Debecker's "connection to," "participation in," and "involvement with" the murder. Here, twenty-two years after the murder, no competent evidence ever has been presented or tendered, to any court, that Officer Debecker participated in or had any involvement with the murder. (*See supra* at 24-26.) The *only* actual historical fact ever established in the state court record was that Officer Debecker's AK-47 was stolen well prior to the murder—in a context where the trial evidence tended to place Debecker's previously stolen AK-47 instead in the hands of the Aguilar brothers during the shooting spree and murder. (*Supra* at 2-18, 25.)

Especially against that backdrop, the state supreme court's rejection of the claims presented in Ground 5 was not an unreasonable application of *Strickland*.

As noted previously, review of a state court's holding under the performance prong of *Strickland* is doubly deferential under AEDPA. The question before the court under AEDPA thus becomes one of "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

Under this doubly deferential standard of review, there certainly was a reasonable argument that counsel satisfied *Strickland*'s deferential performance standard when

counsel decided to not pursue further investigation regarding Officer Debecker. Strategic choices made after a reasonable investigation are "virtually unchallengeable;" and a decision to not investigate further "must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690-91. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam). In the present case, lead counsel's best recollection thirteen years after the capital murder trial was that his investigator did not uncover any useful information after investigating whether Officer Debecker was involved in the murder. (*See supra* at 27.) Based on the record presented to that court, the state supreme court reasonably could conclude that counsel did not render deficient performance by opting to not expend further investigative resources on the issue.

The inability of any of the four defense attorneys involved, thirteen years after the fact, to further recall the specifics of what the investigator looked at in his investigation does not rebut the strong presumption of competence and does not establish ineffective assistance of counsel. Rather, it simply reflects that the party with the burden of proof on post-conviction review failed to present competent evidence establishing deficient performance in this regard. Petitioner presented no evidence at the state evidentiary hearing establishing that counsel were on notice of any additional actual specific fact that would prompt further investigation over and above the investigation that counsel testified occurred regarding Officer Debecker. (*See, e.g.*, ECF No. 16-20 at 23.)

There further was a reasonable argument that counsel satisfied *Strickland*'s deferential performance standard when counsel decided to not present evidence at trial that one of the AK-47s had been stolen from Officer Debecker. Strategic choices made after reasonable investigation, again, are "virtually unchallengeable." *Strickland,* 466 U.S. at 690-91. Counsel clearly testified as to the strategic reasons why the defense decided to not present evidence that one of the AK-47s used in the shooting spree had been

stolen from Officer Debecker. Counsel was concerned that such a defense effort might be viewed as unreasonable and paranoid by the jury; that the effort further would open the door to admission of the Aguilar brothers' collective past involvement with weapon offenses, stolen weapons, and assault weapons in particular; and that the defense thereby might lose the jury as to penalty even before the penalty phase might be reached. (*See supra* at 27-29.) There were substantial prior offenses involving weapons offenses, stolen weapons, and/or assault rifles with which to be concerned. (*See supra* at 22-23.)[13] The mere fact that one of the AK-47s had been stolen from Officer Debecker was not inherently exculpatory, and any attempt by the defense to bootstrap that fact into something more risked opening the door to far worse prior bad act evidence in the guilt phase. On the record presented to the state supreme court, the court's holding that counsel's strategic decision did not constitute deficient performance clearly was not an objectively unreasonable application of *Strickland*.

Ground 5 therefore does not provide a basis for federal habeas relief.[14]

-------------------------

[13]As noted previously, given that the State was prosecuting the brothers as coconspirators and aiders and abettors as well as principals, opening the door to prior bad acts by Gilbert Aguilar posed a corresponding substantial risk also to David Aguilar.

[14]Even if the Court were to reach the prejudice issue under an assumed *de novo* standard of review, Petitioner would not be entitled to either relief or an evidentiary hearing on the bare allegations presented in the pleadings as to Officer Debecker's "involvement." Conclusory allegations that are not supported by a statement of specific facts do not warrant habeas relief. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994.) Aguilar presents no specific allegations of actual historical fact—after a state court evidentiary hearing where Petitioner had the benefit of both counsel and an investigator and further opportunity for investigation by federal habeas counsel—that would lead to a conclusion that Petitioner was prejudiced by the failure to investigate further as to Officer Debecker. That is, he presents no specific allegations as to such involvement.

In this regard, Petitioner points to an initial description of the shooter radioed by Officer Chad Brown to other officers as a heavy set white male with a shaved head. (*See* ECF No. 68 at 7 (citing to testimony by Brown and another responding officer).) Notwithstanding this early description, Officer Brown positively identified Gilbert Aguilar, who was bald at the time, as the shooter from the 7-Eleven videotape and also at trial. (*See supra* at 12-13.) Marla Emerson also positively identified Aguilar. (*See supra* at 8.) There was no outstanding bald white "mystery man" that was not accounted for by the witnesses' trial testimony. Nor, critically, has Petitioner ever tendered any evidence that (a) Officer Debecker was a heavy set, bald, white male on August 7, 1996; or (b) any witness in fact ever has positively identified Debecker rather than Gilbert Aguilar as the

## B.    Ground 6: Photographic Lineup

In Ground 6, Petitioner alleges that he was denied effective assistance when counsel failed to move to suppress identification evidence wherein neighbor Joyce Brown identified Gilbert Aguilar. Petitioner alleges that Brown presented "the most compelling evidence" at trial when she identified Aguilar as "the man she had seen walking away from the murder scene shortly after the murder occurred." He maintains that the identification procedure was suggestive because a detective stated to Brown that individuals might have grown their hair out. He further alleges that the evidence was both suggestive and highly prejudicial because Gilbert Aguilar was in jail clothing. Given that the brothers were tried as coconspirators and aider and abettors, Petitioner maintains that he was prejudiced by admission of the evidence. (ECF No. 28 at 19-20.)

As summarized previously herein, Joyce Brown testified, *inter alia*, that: (1) she was a neighbor of Gloria Olivares, David Aguilar's girlfriend, in the next, four-unit building over across a walkway; (2) before the shooting started on the evening in question, she observed Gilbert Aguilar openly carrying a rifle and David Aguilar with his hands obscured by a poncho walking together in the general direction of the 7-Eleven; and (3) after the shooting had started, she later heard a police officer yelling "put your gun down, put your gun down" before observing through her window Gilbert Aguilar running across her yard and also observing the officer. (*See supra* at 2-3, 12.)

///

---

shooter. Indeed, David Aguilar's post-conviction counsel expressly conceded that "neither of the brothers look all that Hispanic." (ECF No. 16-20 at 137.)

Given the disposition in the text, however, the Court has no occasion to reach the prejudice issue on the investigation claim in Ground 5.

Petitioner further maintains that Officer Debecker's alleged possible involvement tied in with David Aguilar's theory of an alternative suspect and government "set up," in connection with Ground 9. (ECF No. 68 at 5.) Neither Ground 5 nor Ground 9, discussed *infra*, have merit separately. They have even less merit when combined, as the adverse risks associated with pursuing the two possible defense theories separately would have been compounded by pursuing them both together. Defense counsel had a much better appreciation than did Aguilar of how such wholly unsupported and paranoid defenses likely would have played out before a jury if raised during the guilt phase.

Specifically relating to her identification of Gilbert Aguilar, including in relation to seeing him together with David Aguilar, Joyce Brown testified as follows. She knew David Aguilar from his being Gloria Olivares's boyfriend; and she had seen him out "working on his cars" and such "like every day, every other day," for "maybe about a year." Prior to August 7, 1996, she had seen Gilbert Aguilar also at the Olivares residence "going and coming, maybe once, twice a day" for "[m]aybe a few days, a week" prior to that evening. She described him, *inter alia*, as having "a weird haircut, like bald with a ponytail or some hair someplace else with a bald head." (ECF No. 14-6 at 69-72, 88-90.)

When Brown observed the Aguilar brothers walking north that evening with Gilbert Aguilar openly carrying a rifle, David Aguilar was approximately six feet away from her, and Gilbert was approximately ten to twelve feet from her. The area was in Brown's characterization "lit" by a streetlight. There was enough light to see facial features. Nothing obstructed her line of sight as they walked by her unit on Mantis Way, and she was able to see the two men clearly. She observed them during the time that they walked past her building, walking at "a steady pace, and going somewhere." (*Id.* at 75, 77-79, 92-94, 114.)

When Brown later saw Gilbert Aguilar running across her yard after the shooting, her view again was not obstructed; and the streetlight on Mantis again provided lighting. He was wearing a black tank top just as he had been wearing on the way out earlier. He was approximately four feet from her window. (*Id.* at 76, 83, 90-91, 95-97, 112-13, 115.)

Joyce Brown testified that she later viewed a photographic lineup with photographs of approximately six males. She initially was unable to identify anyone from the lineup because she "was looking for a bald head with a pony tail." What the investigating detective then said to her at the lineup was excluded during her testimony on a defense hearsay objection. At the lineup, she thereafter focused on "just the looks and not the hair style;" and she was able to identify Gilbert Aguilar with that focus. (*Id.* at 97-99.)

///

///

At trial, Joyce Brown positively identified each brother separately, despite intervening changes in appearance. She was unequivocal in her in-trial identification of each brother. (*Id.* at 70, 73-74, 77, 83-85, 114-16.)

Metro Detective Franks testified at trial that he showed the photographic lineup to Joyce Brown at her residence on August 29, 1996, which was just over three weeks after the incident. According to his testimony, Franks was aware at the time that Brown already knew David Aguilar as a neighbor prior to the incident. He showed Brown an array of photographs of six males with similar appearance, including a current photograph of Gilbert Aguilar. (ECF No. 14-10 at 132-34.)

Detective Franks testified as follows specifically regarding the identification:

Q. Did you suggest to her in any way that Gilbert Aguilar's picture was in that lineup?

A. I did not.

Q. Did you attempt to influence her decision at all?

A. No, sir.

. . . . .

Q. When Mrs. Brown viewed the lineup, was she able to identify Gilbert right away?

A. No, sir.

Q. Did you explain certain things to her after she had some difficulty?

A. She kept referring to the bald man, and I re-explained to her that hair grows out, and unless you cut it every day you're not going to be bald every day. I then asked her to review the lineup, and she picked out Gilbert Aguilar.

Q. After she concentrated on the facial features, did she have any difficulty ID'ing Gilbert Aguilar?

A. No, sir.

(*Id.* at 134.)

///

///

///

During the second day of the state post-conviction evidentiary hearing, the trial exhibit with the original "six-pack" photographic lineup was retrieved from the evidence vault. (ECF No. 16-20 at 33-34, 88.)

As reflected through the hearing testimony of Gilbert Aguilar's lead trial counsel, William Wolfbrandt, Jr.: (1) while Wolfbrandt recognized the T-shirt that Aguilar was wearing as jail clothes with his twenty-five years of criminal defense experience, the jailhouse nature of the T-shirt would not have been apparent to a lay person who was not similarly familiar with what pretrial detainees wore (*Id.* at 88-89, 96-98); (2) in particular, nothing on the shirt said "jail," "detention" or "CCDC;" nor did it have any other indication on it that would indicate to a layperson that it was jail clothing (*id.* at 97-99); (3) moreover, nothing about the T-shirt singled out Gilbert Aguilar as being in jail clothes in comparison to the other males in the lineup, all but one of whom were attired substantially similarly (*id.* at 98-99); (4) all six of the photographs had Metro identification numbers, which also were assigned for other purposes, such as photographs for work cards (*id.* at 99-100); (5) in this regard as well, all six of the photographs had such numbers, so nothing about the presence of the numbers singled out Gilbert Aguilar from the other five males in the photographic array (*id.*); and (6) while counsel had "seen better lineups" in terms of matching physical build, he testified that Aguilar "doesn't stand out based on clothing," and the photographic identification was not subject to suppression in either respect in his opinion (*id.*).[15]

---

[15]Petitioner asserts in the reply: "At trial, Detective James Michael Franks testified that he created a six-pack photograph lineup using booking photos of six individuals, including Gilbert, who was *wearing jail or prison clothing* (ECF No. 14, Ex. 39 at 131-32)." (ECF No. 68 at 9.) Detective Franks did not testify at trial that he used booking photos, and he did not testify that Aguilar was wearing jail or prison clothing. All that he reflected in his actual trial testimony was that the six photographs had Metro ID numbers on them. (ECF No. 14-10 at 132.) The evidentiary hearing testimony referenced in the text further addresses how Gilbert Aguilar—and the other males in the lineup—were dressed. Neither Detective Franks's trial testimony cited by Petitioner nor the evidentiary hearing testimony referenced in the text reflects that Gilbert Aguilar was presented in the six-pack in a suggestive manner that in any way singled him out from the other five males in the lineup. At least with respect to suggestiveness, that is the key point. Petitioner cites no actual

The state district court found, *inter alia*, as follows, in addressing a claim pertaining to both the photographic identification evidence by Joyce Brown and the admission of other photographs of the Aguilar brothers as well:

> First, there was nothing about the photographs of Gilbert that would indicate he was in custody because his appearance and attire were consistent with that of a non-detained person. EH Day 2 at 97-97. Moreover, although the inscription "Metropolitan Police Department" appeared on the photographs of Gilbert, those markings and numbers were equally consistent with non-criminal identification cards and paperwork, such as those carried by an individual employed by a gaming establishment. EH Day 2 at 98. Second, the remaining photographs, did not indicate any prior link with the police or suggest Defendant Dayomashell [David Aguilar] had a past criminal record, and the State did not refer to the photos as "mugshots." . . . . Finally, Defendant Gilbert's counsel reviewed the photo line-up prior to trial and would have sought its exclusion if it posed some irregularity or prejudice. EH Day 2, at 27-28. Instead, he believed the photographic lineup was nonsuggestive to the extent of not providing a good faith basis for a suppression argument. EH Day 2 at 99.

(ECF No. 16-24 at 16.)

The Supreme Court of Nevada rejected the claims presented by post-conviction counsel to that court on the following grounds:

> [A]ppellants claim that trial counsel were ineffective for failing to challenge the photo line-up that was admitted at trial. Specifically, appellants claim that the photo shows appellant Gilbert in his jail clothing.[FN1] Appellants fail to demonstrate that trial counsel were deficient. At the evidentiary hearing, trial counsel testified that they did not believe they had any grounds to challenge the photo line-up because while, to a person familiar with jail clothing, the picture did show Gilbert in his jail clothing, a person unfamiliar with jail clothing would have thought he was wearing a t-shirt. Trial counsel is not required to make futile objections. *Donovan v. State*, 94 Nev. 671, 584 P.2d 708 (1978). . . . . Therefore, the district court did not err in denying these claims.
>
> [FN1] To the extent that appellant claims that trial counsel should have filed a pretrial motion to suppress the photo line-up because the officers may have prompted the eyewitnesses, appellant failed to demonstrate that this claim had merit. Appellants failed to provide this court with a copy of the trial transcripts. The burden is on appellants to provide an adequate record

evidence in the state court record that would lead to a contrary conclusion that the array instead singled out Aguilar from the other males.

Related testimony by the two lead counsel respectively for the Aguilar brothers that was received before the original six-pack photographic array was retrieved from the evidence vault contained nothing significant. Thirteen years after the trial and without their defense files, neither definitively recalled anything of significance, prompting the retrieval of the six-pack exhibit during the evidentiary hearing. (*See* ECF No. 16-19 at 67, 93; ECF No. 16-20 at 23-34.)

enabling this court to review assignments of error. *See Thomas v. State*, 120 Nev. 37, 43 n.4, 83 P.3d 818, 822 n.4 (2004); *see also Greene v. State*, 96 Nev. 555, 558, 612 P.2d 686, 688 (1980); *Jacobs v. State*, 91 Nev. 155, 158, 532 P.2d 1034, 1036 (1975).

(ECF No. 16-36 at 3-4.)

The state supreme court's rejection of a claim based upon Gilbert Aguilar being in jailhouse clothing was neither contrary to nor an objectively unreasonable application of clearly established federal law. At the outset, the state courts found as a fact that Gilbert Aguilar's appearance in the photograph was consistent with a non-detainee because to a person unfamiliar with the local jail clothing he would appear to be simply wearing a T-shirt. That factual finding was amply supported by the state court record and easily withstands the deferential standard of review of state court factual findings under section 2254(d)(2). (*See supra* at 36-37.) Against that backdrop, the state supreme court's conclusion that counsel did not provide deficient performance by failing to raise a futile objection on this basis was not an objectively unreasonable application of clearly established federal law under the doubly deferential standard of review applicable under *Strickland*'s performance prong and AEDPA.

Turning to the remainder of Ground 6, based upon Detective Franks's statement to Joyce Brown during the photo lineup, Respondents contend that *Pinholster* bars the Court from considering the trial transcript because it was not included by Petitioner in the record before the state supreme court.[16] *Pinholster* does state "that review under § 2254(d)(1) is limited to the record that was before *the* state court *that* adjudicated the claim on the merits." 563 U.S. at 181 (emphasis added); *see also id.* at 192 n.14 ("Both parties agree that these billing records were before the California Supreme Court."). The

---

[16]Petitioner suggests that the state supreme court applies "this procedural default" unfairly and inconsistently. (ECF No. 68 at 13.) However, the state supreme court did not hold that the claim was barred by a procedural default. The state supreme court instead held that Petitioner "failed to demonstrate that this claim has merit." That would appear to constitute a merits holding, based on a failure of proof on appeal, not the application of a state procedural bar. Moreover, procedural default has not been raised by Respondents as a defense to Ground 5. *Cf. McDaniels*, 813 F.3d at 775 n.3, 781 n.8 (the State had not argued that the petitioner's failure to ask the state appellate court to augment the record amounted to a procedural default, and the court of appeals accordingly proceeded to the merits of the claim).

38

Ninth Circuit has held, however, that federal habeas review under AEDPA is not limited under *Pinholster* to the record actually before the appellate court that decided a claim on the merits but instead extends to all material in the state court record in the lower court. *See McDaniels v. Kirkland*, 813 F.3d 770, 780-81 (9th Cir. 2015) (en banc); *Jamerson v. Runnels*, 713 F.3d 1218, 1226-27 (9th Cir. 2013).

The Court therefore refers to the trial transcript in adjudicating the remainder of the claim. The Court further will proceed on the assumption that its review of the remainder of the claim is *de novo*. Neither *McDaniels* nor *Jamerson* in particular compels such an assumption. However, the only pertinent holding made by the state supreme court on this portion of the claim was that Petitioner failed to demonstrate that the claim had merit because Petitioner did not provide a copy of the trial transcript on the post-conviction appeal. When this Court considers the trial transcript in its own review, it necessarily will be considering a basis for decision other than that expressly relied upon by the state supreme court, on this claim, when it rejected this portion of the claim on the merits.[17]

On a *de novo* review, this Court holds that Petitioner cannot demonstrate either deficient performance or resulting prejudice from trial counsel's failure to move to suppress Joyce Brown's identification testimony following the photographic lineup. The trial transcript reflects that counsel had no viable basis to suppress the identification testimony.

Petitioner maintains that admissibility of identification evidence is governed by a totality of the circumstances analysis under *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

---

[17]Petitioner suggests that the trial transcript was not necessary for the state supreme court to adjudicate the claim because his claims "were based on the factual allegations in his state petition and explored at the evidentiary hearing." (ECF No. 68 at 13.) The factual allegations of a pleading of course are not evidence, and the petitioner has the burden of proof on state and federal post-conviction review. The trial transcripts of the testimony of Joyce Brown and Detective Franks in fact were necessary to review the claim, and Petitioner's state post-conviction appeal counsel should have made those existing transcripts part of the record on that appeal. Now on federal review, Ninth Circuit law requires that this Court review the pertinent transcripts. It is those transcripts, not the allegations in Petitioner's pleadings, that determine the outcome on the claim.

However, the *Biggers* analysis applies only if the identification procedure used was suggestive in the first instance. *Biggers* itself involved an inherently suggestive procedure, a one-on-one showup. *Biggers* otherwise does not state a general constitutionally-mandated test for admissibility of identification evidence that must be inexorably applied any time that identification evidence is offered.[18]

In the present case, Joyce Brown was not presented with a one-on-one either in-person or photo showup. She instead viewed a six-photo array with males with a similar appearance. As the preceding discussion reflects, there was nothing inherently suggestive about the six-pack photo lineup that singled out Gilbert Aguilar from the other five males. (*See supra* at 36.) Petitioner maintains that Detective Franks's statements were improperly suggestive. However, all that the trial transcript reflects is that Franks "re-explained to her that hair grows out, and unless you cut it every day you're not going to be bald every day." (*See supra* at 35.) That statement does not inherently single out any subject, and it is not suggestive of a single subject.

The *Biggers* totality of the circumstances test thus would not even be implicated on a motion to suppress Joyce Brown's identification testimony.

Moreover, even if the *Biggers* analysis were applied, such a motion to suppress would not present a viable issue. Under that analysis, "reliability is the linchpin in determining the admissibility of identification testimony." *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). Courts considering a claim that admission of the identification testimony violates due process look to the following factors:

> The factors . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the

---

[18] *See, e.g., Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012) ("The Court [has] emphasized [in prior cases], first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary . . . ."); *Manson v. Brathwaite*, 432 U.S. 98, 107, 109 (1977) (single photo); *Biggers*, 409 U.S. at 198 (one-on-one showup); *cf. Manta v. Chertoff*, 518 F.3d 1134, 1144-45 (9th Cir. 2008) (referencing the *Biggers* factors in an extradition proceeding where the witness made the identification after being shown "only a single photograph . . . displayed as part of a passport with Manta's name and other identifying information").

confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.* This same reliability standard governs the admissibility of both the initial identification and any subsequent in-court identification. *See, e.g., Biggers*, 409 U.S. at 198; *see also Manson*, 432 U.S. at 110 n.10 (under the totality of the circumstances approach followed by the Supreme Court, "if the challenged identification is reliable, then testimony as to it and any identification in its wake is admissible").

First, the opportunity of Joyce Brown to observe Gilbert Aguilar—both prior to and at the time of the offenses—weighs strongly in favor of reliability of the identification evidence.

Notwithstanding Petitioner's allegations on this claim, Joyce Brown was not a witness who simply saw a bald man that she had never seen before running across her yard for a few seconds. Rather, Joyce Brown was the next-door neighbor of Gloria Olivares, David Aguilar's girlfriend. She knew Gilbert's brother David from his being around for approximately a year. And she had seen Gilbert Aguilar at the Olivares residence "maybe once, twice a day" for "maybe a few days, a week" prior to the incident. (*See supra* at 34.)

When Brown first saw Gilbert Aguilar on the evening of August 7, 1996, she saw him walking with David Aguilar, with whom she already was familiar from his being around for a year. The Aguilar brothers were walking at a steady pace—not running—by the porch where she was sitting, with David being about six feet away from her and Gilbert ten to twelve feet away. The area was illuminated by a streetlight, and there was enough light for her to see facial features. Nothing obstructed her view, and she could see the two men clearly. (*See supra* at 34.)

When Brown later saw Gilbert Aguilar running across her yard after the shooting, wearing the same black tank top as earlier, the area outside her front window again was illuminated by the streetlight; nothing obstructed her view; and Gilbert Aguilar was only about four feet from her window. (*See supra* at 34.)

Joyce Brown thus had a substantial, prolonged, and clear opportunity to observe Gilbert Aguilar, both prior to and at the time of the incidents in question.

Second, Brown's degree of attention at the time also weighs strongly in favor of the reliability of the identification evidence.

Joyce Brown's attention most certainly was focused when she saw Gilbert Aguilar on August 7, 1996. When she saw the Aguilar brothers walking by the first time, Gilbert Aguilar was openly carrying a rifle. Brown not only noticed Aguilar with the rifle, she was so frightened by seeing him with the rifle that she went inside and locked the door. (*See supra* at 4.) Thereafter, when she later saw Aguilar again running across her front yard, she was not merely casually looking out her window but instead was looking precisely because of all the shooting and the police command that she had just heard. (*See supra* at 13.)

Third, it would appear that Brown's description of Aguilar was accurate, including as to her description of his, at the time, *inter alia*, being bald. (*See supra* at 34-35.)

Fourth, the photographic identification took place only three weeks and a day after the incident. (*See supra* at 35.)

Finally, Brown's initial lack of identification during the lineup does tend to weigh the other way. However, this initial lack of identification itself must be weighed against Aguilar's change of appearance during the intervening time. When Brown stopped looking for a bald man in the group and focused instead on features rather than hair, she made a positive identification. Her level of certainty then, and later at trial even after further changes in Aguilar's appearance, weighs in favor of reliability. (*See supra* at 34-35.)

Weighing all of the foregoing *Biggers* factors together as well as against any argued suggestiveness in Detective Franks's statement (*see* ECF No. 68 at 10-11), the Aguilars did not have a viable basis to suppress Joyce Brown's identification testimony.

David Aguilar thus can demonstrate neither deficient performance nor resulting prejudice from trial counsel's failure to move to suppress the identification evidence.

Ground 6 therefore does not provide a basis for federal habeas relief.

**C.      Ground 7: Search of Gloria Olivares's Residence**

In Ground 7, Petitioner alleges that he was denied effective assistance when trial counsel failed to move to suppress the results of the search of Gloria Olivares's residence on the basis that her consent to the search was not voluntary. (ECF No. 28 at 20-23.) The state post-conviction proceedings focused on the standing issue.

The search of Gloria Olivares's residence resulted in the recovery of, *inter alia*, the two AK-47s used in the shooting spree. (*See supra* at 3, 14-17.)

When the police first encountered David Aguilar and Gloria Olivares after the shooting on the evening of August 7, 1996, they still were wet from having been in the pool in their street clothes. (*See supra* at 13 & n.7.)

According to their collective testimony during the guilt phase, Metro Officers Mark Dwiggins and Stewart Emry conducted the initial questioning of Aguilar and Olivares, who were questioned separately. Their stories were not consistent with one another, and Aguilar further was "continually trying to come up with a new story." Officer Dwiggins testified that while Gloria Olivares was within sight of David Aguilar, "[s]he was trying to keep up with his story, was obviously, you know, frightened and evading the questions." (ECF No. 14-9 at 23-28, 48-52, 56-57.)

While Olivares still was within sight of Aguilar, Olivares "wavered back and forth several times" as to granting the police consent to search her residence. Officer Dwiggins filled out consent cards twice only to tear them up after Olivares then refused to sign them. Over the course of this time, Aguilar became more agitated and confrontational; and officers were attempting to put Aguilar in what Dwiggins described as "a position of disadvantage" to maintain their safety. Olivares "became very irate, saying that the police were beating him up." Officer Dwiggins therefore took Olivares over to the nearby temporary command post, where she would not be able to see what was transpiring with Aguilar. (*Id.* at 51-52.)

At two different points in his direct testimony, Officer Dwiggins testified as follows with regard to Gloria Olivares's consent to a search thereafter:

Q.   And while you [were] in the company of Gloria, were you able to obtain a consent to search?

A.   Once we got to the command post, I again was – continued talking to her, just making small talk at that point. And then again asked her if she would sign a consent to search, again to rule her out as having any involvement in it; and she finally agreed to.

. . . . .

Q.   Did Gloria – or did Gloria, the lady who was with David Aguilar, appear to be frightened?

A.   She became more cooperative when we went away from where David couldn't see her. When we got back to the command post she became more forthright with the story, and again with the consent to search she had no problem signing it once we got to the command post, where she was out of the sight of David Aguilar.

(*Id.* at 52, 56-57.)[19]

Both a photocopy and the original of the signed consent form were received into evidence in the guilt phase. (*Id.* at 52-55; ECF No. 14-10 at 120-21.)

Before the grand jury, Gloria Olivares testified that she signed the consent form and gave the police consent to search her residence. (ECF No. 13-2 at 98-99.)

In regard to standing, the guilt phase evidence tended to establish that David Aguilar had been present at Olivares's residence. (*See supra* at 2-4, 33-34.)

However, the penalty phase evidence established that Gloria Olivares had obtained two protective orders that legally prohibited David Aguilar from being there. Her supporting allegations reflected a continuing fear of Aguilar.

According to the testimony of Gina Sumner, then a Metro patrol officer, she responded to a domestic violence call at the Olivares residence on January 23, 1995. When officers arrived, Olivares was laying on the couch and Aguilar was kneeling over her. While Olivares was uncooperative, her daughter stated that Aguilar had pushed Olivares to the ground and kicked her in the head. Olivares was transported for medical attention, and Aguilar was arrested for domestic violence. (ECF No. 14-18 at 67-71.)

_____

[19]Petitioner states at one point that Olivares was "escorted back to the police station." (ECF No. 68 at 18.) That was not the testimony at trial. Officer Dwiggins instead testified that he took Olivares to "the command post." A temporary command post had been set up at the time in the vicinity as officers investigated the incident. (*See, e.g.*, ECF No. 14-8 at 47-48; *see also* ECF No. 14-9 at 120-21.)

Thereafter, Gloria Olivares obtained a protective order on or about June 22, 1995. Her supporting affidavit attested:

> David Aguilar or David Chavez has two or more charges against him for domestic violence in North Las Vegas, but the latest incident was in February of 1995. Were [sic] he flipped me over his shoulder, kicked me with his steel-toed boots and knocked me out. He was arrested under David Chavez. I have asked him to leave on his own, but instead of leaving he— treating [sic] to punch my face in or do something to get me kicked out of my apartment or put in jail. This happens every day. I'm scared something bad might happen if he does not leave. He is appearing in court on the 20th of June for battery. . . . . I really need him out of my apartment. I am scared to death of him.

(*Id.* at 73-74.)

Olivares obtained a second protective order on or about May 2, 1996, only three months before the August 7, 1996 offenses. Her supporting affidavit reflected continued threats and physical abuse by Aguilar. (*Id.* at 72-73.)

When he testified during the penalty phase, David Aguilar initially admitted having battered Olivares, but he then sought to excuse, minimize, and explain away his repeated domestic abuse of Olivares. (*See* ECF No. 14-21 at 87-91.) Aguilar thereafter referred multiple times to a restraining order. (*Id.* at 114, 116.) He testified that, on the evening of August 7, 1996, "[t]hat's what I thought I was being arrested for[,] for breaking the restraining order." (*Id.* at 117.)

Thereafter, in his *pro se* state post-conviction petition, David Aguilar specifically alleged that he and Gilbert Aguilar lived at 3505 Strutz Avenue, which was a short distance to the north off of Pecos, rather than Olivares's residence at 840 Mantis Way, No. 2. (ECF No. 15-12 at 18, 20.) His petition alleged that "David Aguilar made a phone call to Gloria Olivares to see if she would meet him at the pool area, as David had a restraining order against him, and they Gloria and David had been meeting there everynight [sic] for the past week." (*Id.* at 18.)

State post-conviction counsel made no change to David Aguilar's factual allegations in the counseled supplemental points and authorities. (ECF Nos. 16-14 to ///

45

16-16.) Indeed, in an affidavit or declaration submitted by Aguilar in proper person along with the counseled filings, he stated:

> I have specifically instructed my current attorney who is preparing my Supplemental Points and Authorities in Support of my Petition for Writ of Habeas Corpus that under no circumstances shall he delete or amend any of the issues that I raised in my Amended Petition and Memorandum of Points and Authorities filed previously in this matter.

(ECF No. 16-16 at 4.)

At the evidentiary hearing, David Aguilar's lead trial counsel testified that he did not file a motion to suppress the search of Olivares's residence because Aguilar had no standing to challenge the search given that he was not on the lease and was subject to the restraining order legally barring him from being there. Counsel testified that such a motion to suppress "would have been frivolous." (ECF No. 16-19 at 46-47, 91-92.)

The state district court noted during the evidentiary hearing that the pleadings stated "that the defendant did not live there, neither defendant lived there." (ECF No. 16-20 at 34.) The district court thereafter found, *inter alia*, that the Aguilars had no standing to challenge the search of Olivares's residence and that Olivares in any event voluntarily consented, with the court relying upon her grand jury testimony and the State's trial evidence. (ECF No. 16-24 at 15-16.)

The Supreme Court of Nevada rejected the claims presented to that court on the following grounds:

> [A]ppellants claim that trial counsel were ineffective for failing to file a motion to suppress the search of David's girlfriend's apartment. Appellants fail to demonstrate that trial counsel were deficient because they failed to demonstrate that they had standing to challenge the search. The apartment belonged to David's girlfriend and there was a restraining order preventing him from entering the premises. Thus, they did not demonstrate that they had a protected privacy interest in the apartment. *Rakas v. Illinois*, 439 U.S. 128, 130–31 n. 1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search."); *Katz v. United States*, 389 U.S. 347, 352 (1967) (recognizing that the Fourth Amendment requires an inquiry into whether the person claiming the protection was entitled to assume privacy at the place and under the circumstances concerned); *see also State v. Taylor*, 114 Nev. 1071, 1077, 968 P.2d 315, 320 (1998) (recognizing that one must have an objective and subjective expectation of privacy in the place to be searched). . . . . Therefore, the district court did not err in denying these claims.

(ECF No. 16-36 at 4-5.)

The state supreme court's rejection of this claim was neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court.

With regard to doubly deferential review of counsel's performance under AEDPA, there clearly was a reasonable argument that counsel satisfied *Strickland*'s deferential performance standard when counsel declined to pursue a motion to suppress the results of the search of Olivares's residence due to lack of standing.

In *Rakas v. Illinois*, 439 U.S. 128 (1978), the Supreme Court distinguished between persons legitimately on the premises searched and persons who were wrongfully present:

> In *Jones* [*v. United States*, 362 U.S. 257 (1960)], petitioner was present at the time of the search of an apartment which was owned by a friend. The friend had given Jones permission to use the apartment and a key to it, with which Jones had admitted himself on the day of the search. He had a suit and shirt at the apartment and had slept there "maybe a night," but his home was elsewhere. At the time of the search, Jones was the only occupant of the apartment because the lessee was away for a period of several days. 362 U.S., at 259, 80 S.Ct., at 730. Under these circumstances, this Court stated that while one wrongfully on the premises could not move to suppress evidence obtained as a result of searching them,[FN9] "anyone legitimately on premises where a search occurs may challenge its legality." *Id.*, at 267, 80 S.Ct., at 734.
>
> [FN9] The Court in *Jones* was quite careful to note that "wrongful" presence at the scene of a search would not enable a defendant to object to the legality of the search. 362 U.S., at 267, 80 S.Ct., at 734. The Court stated: "No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. *This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched.*" *Ibid.* (emphasis added). Despite this clear statement in *Jones*, several lower courts inexplicably have held that a person present in a stolen automobile at the time of a search may object to the lawfulness of the search of the automobile. *See, e. g., Cotton v. United States*, 371 F.2d 385 (CA9 1967); *Simpson v. United States*, 346 F.2d 291 (CA10 1965).

439 U.S. at 140-41 & n.9.

Given this clear distinction drawn by the United States Supreme Court in *Rakas*, the state supreme court's rejection of the claim in Ground 7 was not an objectively

47

unreasonable application of *Rakas* and the performance prong of *Strickland*. It was not only undisputed, it was affirmatively alleged in David Aguilar's state petition, that he was prohibited from being at the Olivares residence by a restraining order. Based upon the record, the allegations, and the arguments presented to the state courts on post-conviction review, a conclusion that David Aguilar had no standing to challenge the search of the Olivares residence because he could not lawfully be there was not an objectively unreasonable application of clearly established federal law.[20] Moreover, the mere fact that the Aguilar brothers were tried as, *inter alia*, coconspirators would not allow David Aguilar to rely on any standing argument that Gilbert Aguilar perhaps might have had. *E.g., United States v. Padilla*, 508 U.S. 77 (1993).

Petitioner cites no controlling apposite case law to the contrary, and he in particular cites no apposite law that would have been on the books at the time of defense counsel's analysis of the case prior to the October 1997 trial. Counsel's conduct must be evaluated from counsel's perspective at the time, including the case law existing as of that time. *See, e.g.*, *Strickland*, 466 U.S. at 689; *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994). None of the cases cited by Petitioner involved a situation where it was undisputed that the defendant was barred by a court order from being on the premises searched.[21]

Petitioner in particular likens Olivares's acquiescence to Aguilar's presence at her residence to a hotelier acquiescing to a hotel guest remaining past checkout time, as discussed in *United States v. Lanier*, 636 F.3d 228, 232 (6th Cir. 2011). (ECF No. 68 at

---

[20]The state court record further strongly supported an inference that any presence by David Aguilar at Olivares's residence was secured not by permission given freely but instead by compelled permission or acquiescence obtained via continuing intimidation, violence, and fear. Presence secured in such a manner arguably would have constituted presence secured through unlawful conduct even without regard to an extant restraining order.

[21]Petitioner cites to a number of federal appellate decisions involving, *e.g.,* overnight guests and hotel guests that were not published until years after the October 1997 trial. Even if these particular cases were apposite, they were not available at the time of counsel's analysis of Aguilar's case prior to October 1997. Nor were federal appellate decisions, of any date, binding on the state supreme court at the time of its May 9, 2012 decision on the state post-conviction appeal with respect to the underlying standing issue. In all events, the cases are inapposite because they do not involve a defendant subject to a restraining order.

20-21.) Regardless, neither *Lanier* nor the other lower court authorities cited in *Lanier* constituted clearly established federal law *as determined by the United States Supreme Court* at the time of the state supreme court's May 9, 2012 decision on Aguilar's state post-conviction appeal. The state court accordingly was not obligated to follow such decisions, whether directly or by, arguably strained, extension.

Petitioner urges in this same vein that "[t]he Nevada Supreme Court did not cite to any authority establishing that an order of protection meant, as a matter of law, that an individual can have no standing under the Fourth Amendment." (ECF No. 21.) Petitioner misapprehends his burden under AEDPA. It is the petitioner's burden to demonstrate a lack of congruence with United States Supreme Court precedent, and a state supreme court has no burden to affirmatively demonstrate congruence with the Court's precedent. The state court need not cite Supreme Court authority directly on point and need not even be aware of the Court's precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Esparza*, 540 U.S. at 15-16.

No Supreme Court case has addressed the specific question of whether a defendant barred from being present in a residence by a restraining order who nonetheless disregards the order has standing to challenge a search of the residence, especially where the defendant had no other independent lawful possessory interest in the property such as a preexisting owner or lessee. Critically, there further was no such specific case on point in either 1997 or 2012. The state supreme court's holding on the point therefore cannot be contrary to a holding of the Supreme Court. *E.g., Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015).

To demonstrate that the state supreme court's holding on the underlying standing issue was an objectively unreasonable application of Supreme Court precedent, Petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Petitioner cannot make that demonstration here, as the state

49

supreme court's application of *Rakas* to the facts presented constitutes an entirely plausible application of the general principle in *Rakas* and prior case law "that 'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search." 439 U.S. at 141 n.9.

The state supreme court's rejection of the corresponding ineffective-assistance claim accordingly was neither contrary to nor an unreasonable application of clearly established federal law.

Ground 7 therefore does not provide a basis for federal habeas relief.[22]

## D.    Ground 8: 7-Eleven Surveillance Video

In Ground 8, Petitioner alleges that he was denied effective assistance when trial counsel failed to challenge the introduction of the 7-Eleven surveillance video. He maintains that counsel should have questioned the reliability of the video's time stamp and challenged the authenticity of the techniques used to edit the trial exhibit from a much longer surveillance videotape, including by use of an expert witness. Petitioner alleges

---

[22]Petitioner's factual allegations in his federal amended petition that he and his brother lived at Olivares's residence are directly contrary to his allegation on state post-conviction review that they both instead lived on Strutz Avenue at the time of the search. An argument thus could be made that Ground 7 is unexhausted as alleged in federal court because Petitioner thereby fundamentally altered the claim presented to the state courts and sought to put it in a stronger evidentiary posture. *See Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (en banc) (different factual allegations render a claim unexhausted if the allegations fundamentally alter the legal claim considered by the state courts or place the case in a significantly different and stronger evidentiary posture than when the state courts considered the claim).

Given the disposition in the text, this Court, like the state supreme court, has no occasion to reach the prejudice prong of *Strickland*.

Petitioner further takes issue with Metro using a SWAT team to forcibly enter Olivares's residence after she gave her consent to the search while she was at the temporary command post. (ECF No. 68 at 18-19.) However, at that time, there was at least one suspect still at large potentially armed with a high-powered weapon that he had very recently used; and Officer Chad Brown previously had observed the shooter that he saw go into that building. (ECF No. 14-10 at 121-22; *see supra* at 12.) There is no issue of substance pertinent to these proceedings with the manner in which Metro entered the unit after Olivares gave her consent to the search.

In all events, the state supreme court's holding on the underlying standing issue was not an objectively unreasonable application of clearly established federal law. That holding is fatal to Aguilar's ineffective-assistance claim in Ground 7.

50

that the failure to challenge the introduction of the tape "allowed the prejudicial videotape to be played to the jury without successful challenge lending evidentiary support to the State's murder time-line." (ECF No. 28 at 23-24.)

As summarized previously, the trial evidence reflected that the Aguilar brothers were in the nearby 7-Eleven when they were asked at about 10:40 p.m. to either stop drinking in the store or leave. They left the store and then were involved in an altercation with the occupants of a vehicle in the parking lot. Afterwards, they left on foot in the general direction of the Atrium Gardens subdivision. Witnesses reported gunfire in that subdivision starting at or after 11:00 p.m. (*See supra* at 5-10.)

Store clerks Ethan Weeks and Fawn Weeks testified that Ethan Weeks came to work at approximately 10:40 p.m. for his 10:45 p.m. to 7:00 a.m. graveyard shift. He was relieving his sister Fawn and two other store clerks who then were finishing up a 3:00 p.m. to 11:00 p.m. shift. Ethan Weeks was the one who, shortly after he arrived, told the Aguilar brothers that they would have to either stop drinking inside or leave the store. Weeks also observed the altercation outside. He called 911 after the brothers left the parking lot on foot to report that the vehicle hit Gilbert Aguilar in the parking lot. (ECF No. 14-6 at 42-45, 47-48, 57-58, 60-66; ECF No. 14-8 at 21-39.)[23]

Ethan Weeks testified that the interval between the time that the brothers walked out the front door of the store and the time that the car hit Gilbert Aguilar in the parking lot "wasn't even five minutes . . . it all happened pretty quick." (ECF No. 14-8 at 35-36.)

Significantly for the current claim, Ethan Weeks testified that he first heard gunfire from "the southeast—more east than south" of the store, the direction of the Atrium Gardens subdivision, about twenty minutes after the Aguilar brothers had left the store.

_____

[23]Ethan Weeks testified in two installments. He was not asked during his initial testimony about the altercation in the parking lot per a pretrial ruling *in limine.* However, the trial court thereafter held that the State could elicit limited testimony regarding the parking lot altercation after Gilbert Aguilar's defense opened the door to evidence of the altercation pursuant to a tactical decision to do so. Ethan Weeks then was recalled for limited testimony regarding the parking lot altercation. (ECF No. 14-8 at 3-21.)

Ethan Weeks referenced the Aguilar brothers by their physical descriptions in his testimony. Their specific identity was established by other evidence in the case.

At that time, there were customers and "off-duty employees" in the store, indicating that Weeks already had relieved the prior 3:00 to 11:00 p.m. shift when the shooting started. Fawn Weeks similarly testified that she first heard the gunfire about fifteen to twenty minutes after the brothers had left the store, after the end of her shift at 11:00 p.m. when she was getting ready to go home. (ECF No. 14-6 at 46-47, 63-64; ECF No. 14-8 at 35-36.)

Surveillance video from the 7-Eleven was played during Ethan Weeks's testimony. The time stamp on the video reflected that the Aguilar brothers walked out the front door of the store at 10:43 p.m. (ECF No. 14-6 at 56-57.)

During his testimony in the penalty phase, David Aguilar maintained, *inter alia*, that "I had just came [sic] from 7-Eleven when somebody started shooting at me." He testified that after the shooting started he gathered up Gloria Olivares and her daughter from her residence and that they then got into the swimming pool together for their safety. (ECF No. 14-21 at 107-11.)

In his state post-conviction petition, David Aguilar alleged that he had left the 7-Eleven, gone with Gilbert Aguilar first to "their residence at 3505 Strutz," and then was in the Atrium Gardens subdivision on the way to see Gloria Olivares when the gunfire started. His claims in the petition regarding the 7-Eleven surveillance video focused on an incident during trial that he alleged constituted a break in the chain of custody and on alleged withholding of exculpatory evidence. (ECF No. 15-12 at 19-21, 28, 41-43, 115-17.)[24]

No allegations or claims in the *pro se* petition were changed by appointed counsel. (*See supra* at 45-46; *see also* ECF No. 16-14 at 13.)

///

_____

[24]Petitioner alleged in particular with regard to exculpatory evidence that the prosecutor "instructed the Engineer to stop the tape for viewing by the Jury at frame showing 10:43 P.M. deleting the entire Hit and Run issue and confussing [sic] the Jury and withholding Exculpatory Evidence pursuant to Brady v. Maryland . . . ." (ECF No. 15-12 at 116.) What actually happened at trial, however, was not that the State withheld any such information from the defense but instead was that the trial court as of that time had excluded the parking lot altercation evidence *in limine*. (*See supra* note 23.)

At the counseled state post-conviction evidentiary hearing, a criminal defense investigator retained for David Aguilar testified. The investigator previously had been an investigator for the district attorney's office. He testified as to his understanding of what the 7-Eleven store owner said to him in 2009 about, *inter alia*, the store's surveillance video procedures back in 1996. The state district court overruled hearsay objections to the testimony, but the court stated that if specifics regarding the particular tape in question became an issue "we may have to have the gentleman here." (ECF No. 16-19 at 18-19.) The investigator testified that he understood, *inter alia*, that: (1) the store owner "was somewhat familiar with [the surveillance system] back in 1996, although the system has since been updated;" (2) back in 1996, VHS tapes were changed out every 24 hours and kept for a full week before being reintroduced in the recorder if there were no intervening incidents; (3) however, "[i]t could be 12 hours, but normally it's a 24-hour tape that's placed in the recorder;" (4) in a homicide investigation, the regular practice would have been for a detective to recover an entire, unedited tape; and (5) it nonetheless was the investigator's "understanding," without explanation as to the source of that understanding or belief, that "about 45 minutes of the tape was turned over." (*Id.* at 13-19.)

The investigator acknowledged on cross-examination, however, *inter alia*, that: (1) the owner was not certain "as far as the exact multi-type plex system that was involved" in 1996; (2) the investigator had not viewed the actual videotape that was in the evidence vault at the courthouse to determine what type of tape it was; (3) he was not aware of what foundation had been laid for admission of the tape at trial; (4) he did not know whether the investigating detectives in this case had viewed the tape before it was impounded; (5) given that he had not actually seen the tape, he was not actually personally aware if it was 24 hours or 45 minutes long; and (6) it nonetheless was his "understanding" that the tape was 45 minutes long, without attributing a personal basis for this knowledge as to a tape that he had not viewed. (*Id.* at 22-27.)

When post-conviction counsel examined the Aguilars' defense counsel regarding the 7-Eleven surveillance video, counsel did not inquire regarding a claim of an alleged

break in the chain of custody. The inquiry focused instead on a different underlying contention that an alleged unedited and unaltered videotape with an accurate time stamp would have supported an alibi defense that the Aguilar brothers were at the 7-Eleven store at the time of the shooting spree. (*See id.* at 38, 116, 131-36; ECF No. 16-20 at 64-66, 74-75, 91-95, 110-11.)

Lead counsel for David Aguilar explained why he did not pursue any such alibi defense based upon the Aguilars instead being at the 7-Eleven during the shooting:

Q.   We had talked just a little bit about the defendant's theory of defense in this case. What was your theory of defense in this particular case?

A.   That David did not shoot Mark Emerson. That he had abandoned whatever he was involved with and went back to the apartment. And after he got back to the apartment, that was when Mark Emerson was shot and killed.

Q.   Defense counsel asked you about developing an alibi based upon the [7-Eleven surveillance] video, based upon 911 tapes. You indicated that you did that.

Do you recall, can you elaborate on—to the extent you recall, what did you do?

A.   We looked at the videotape. We looked at the witnesses. It would have been very difficult for me to present that testimony. Also in lieu—in view of the fact that David told me that he and Gilbert were out there shooting across the field at somebody.

Q.   So your own personal ethics play into the defense that you're able to present during the course of a trial?

A.   Right. I can't present evidence if I know it's not true.

Q.   So when your client is telling you at one point, "Yeah, I was out there shooting a firearm," that's inconsistent with an alibi?

A.   Yes, it is.

Q.   And that poses an ethical dilemma for you?

A.   Yes, it does.

Q.   So it sounds like you really tried to run the best of both worlds, still effectively defending your client based upon his theory of it wasn't him, but still being true to your own ethical responsibilities in light of what he told you?

A.   Yes.

(ECF No. 16-19 at 81-83.)

When Aguilar's post-conviction counsel returned again to the point later, lead trial counsel made the point more bluntly:

> Q.    Mr. Hillman, wouldn't you agree that, considering the time duration when he left the 7/Eleven and the time duration of when the shooting took place, that could constitute reasonable doubt?
>
> [Objection and ruling omitted.]
>
> THE WITNESS: Since David told me that he had been shooting across that field, that kind of torpedoed that defense.

(*Id.* at 116.)

The record from the evidentiary hearing further tended to establish, *inter alia*, that: (1) consistent with Ethan Weeks' testimony at trial, the parking lot altercation lasted five minutes or less (ECF No. 16-20 at 80.); (2) the 911 calls reporting the shooting started at 11:04 or 11:05 p.m. (*id.* at 94); (3) defense counsel for both brothers had access to, and reviewed, the 911 call recordings and dispatch log, which also had a bearing on the assessment of the timeline (ECF No. 16-19 at 43-45; ECF No. 16-20 at 89-90, 94-95); and (4) nothing about the 7-Eleven surveillance videotape or the 911 recordings suggested to David Aguilar's counsel that they had been altered (ECF No. 16-19 at 86-87, 114-15).

Petitioner presented no expert testimony at the evidentiary hearing in any way tending to establish that either: (1) the actual videotape in the trial evidence in fact had been altered or edited for the relevant time period; or (2) the time stamp applied by the surveillance video system in fact was inaccurate to any degree significant to the timeline presented at trial. Petitioner further has tendered no such evidence on federal habeas review.

The Supreme Court of Nevada rejected the claims presented to that court on the state post-conviction appeal on the following grounds:

> [A]ppellants claim that trial counsel were ineffective for failing to prevent the video from 7-11 from being admitted at trial. Specifically, they claim that trial counsel failed to question the authenticity of the tape's time stamp or editing

techniques. Further, trial counsel never filed a motion to suppress the videotape. Appellants fail to demonstrate that trial counsel were deficient. Appellants failed to demonstrate that there was reason to question the authenticity of the time stamp or editing techniques. Further, appellants fail to demonstrate that a motion to suppress would have been successful. . . . . Therefore, the district court did not err in denying these claims.

(ECF No. 16-36 at 7.)

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of the performance prong of *Strickland*. Petitioner failed to overcome the strong presumption that defense counsel's attention to certain issues to the exclusion of others reflected trial tactics rather than sheer neglect. *Gentry*, 540 U.S. at 8. David Aguilar's defense counsel clearly had no reason to question either the substantial accuracy of the surveillance video time stamp or the authenticity of any edited portion of the video. Counsel had no reason to question the time stamp and the tape because his client already had told him that he and his brother were shooting their weapons at the time. Over and above ethical issues, that acknowledgment by Aguilar told counsel what he needed to know about where expert examination into the accuracy of the time stamp and the authenticity of the tape would lead, *i.e.*, nowhere that would significantly disrupt the timeline reflected by the evidence at trial. That trial evidence in particular included testimony by two 7-Eleven store clerks that the Aguilar brothers left the store fifteen to twenty minutes before the shooting started. (*See supra* at 51-52.)[25]

Petitioner nonetheless urges that "there was good reason for counsel to question these things" because "the unedited version of the video would have been 24 hours long,

---

[25]Nothing reflected how far the post-conviction *post hoc* theorizing had strayed from the trial evidence perhaps more so than when state post-conviction counsel asked David Aguilar's lead counsel whether he ever considered calling the 7-Eleven clerks as alibi witnesses. (*See* ECF No. 16-19 at 40-41.) The store clerks did in fact testify at trial. The store clerks, Ethan Weeks and Fawn Weeks, clearly did not testify that they heard the shooting while the Aguilar brothers were inside the store. Nor did they testify that the shooting started while the brothers were in the parking lot. They instead testified that the shooting started fifteen to twenty minutes after the Aguilar brothers had left the 7-Eleven. The testimony of the 7-Eleven clerks thus refuted, rather than supported, any alibi defense based upon the timeline at the 7-Eleven store.

while the final version shown to the jury was only 45 minutes long." (ECF No. 68 at 24.) In fact, Petitioner never actually established at the evidentiary hearing, by a percipient witness testifying from an adequate and reliable recollection, that the actual trial exhibit in the evidence vault had been edited by the State. (*See supra* at 55-56.)[26] It is difficult to imagine how 23 hours of surveillance video of, *e.g.*, people doing their shopping, was vital to the defense of the Aguilar brothers in this capital murder case. In all events, defense counsel did not render deficient performance by declining to pursue such a line of inquiry (a) after David Aguilar told counsel that he and his brother were shooting their weapons, and (b) further in the face of testimony by two store clerks that did not place the brothers on the 7-Eleven premises at a time that would rule out their presence at the shooting spree.

The state supreme court's decision rejecting this claim accordingly was not an unreasonable application of the performance prong of *Strickland*.[27]

Ground 8 does not provide a basis for federal habeas relief.

### E.    Ground 9: Alternative Suspect

In Ground 9, Petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and pursue an alternative suspect theory. Petitioner alleges in particular that: (1) he told his counsel that he and his brother were not the ones that fatally shot Mark Emerson but that they instead "were being set up;" (2) the testimony of

_____

[26]The recollection of trial counsel, thirteen years after the fact, was hardly infallible in establishing what the actual video in the evidence vault contained. (*See, e.g.*, ECF No. 16-19 at 37-38.) State post-conviction counsel for Gilbert Aguilar ultimately copied a portion of the video in the evidence vault and played that portion during the examination of Gilbert Aguilar's lead counsel. Nowhere during that process did state post-conviction counsel present any competent evidence in the evidentiary hearing record as to what was, or was not, included in the evidence vault videotape from which the post-conviction copy was made, which was represented to be the relevant *portions* of the original. (*See, e.g.*, ECF No. 16-20 at 68-69.) What the original did, or did not, in fact contain thus remains a matter of unsubstantiated speculation.

[27]The Court accordingly has no occasion to reach the prejudice prong. The Court notes, however, that Petitioner never has even tendered to any court any expert evidence that would tend to establish that the time stamp on the surveillance video was inaccurate to any significant degree and/or that there was any substantial authenticity issue as to any redacted copy of the original video.

"several" police officers established that the description of the shooter believed to have killed Emerson was a white man with a shaved head; (3) "Petitioner clearly did not meet this description;" (4) the 7-Eleven surveillance video shows an individual standing over David Aguilar and "possibly" stepping on his foot that Petitioner first describes as a white man "with very short hair" and thereafter as "the bald guy;" and (5) the male allegedly left the store right before Petitioner "providing this individual plenty of time to do the shooting." (ECF No. 28 at 24-25.)

Multiple points warrant mention on this claim at the very outset.

First, the State *never* maintained that *David* Aguilar was the bald shooter. The State asserted that *Gilbert* Aguilar, who was bald at the time, was the bald shooter. The brothers were tried as coconspirators and aiders and abettors as well as principals, and under the State's theory of the case David Aguilar was culpable equally with Gilbert Aguilar for the murder of Mark Emerson during their joint shooting spree. (*See supra* at 18.) It thus is irrelevant that "Petitioner clearly did not meet this description."

Second, the other man in the 7-Eleven surveillance video was *not* bald. Post-conviction counsel—who of course was not a witness—referred to the man as bald multiple times during the playing of a copy of the surveillance video at the state court evidentiary hearing. These references led to the following exchange:

> THE COURT: Excuse me counsel. You've referred to that gentlemen [sic] twice now as bald. I don't see that he's bald.
>
> MR. WHIPPLE: Your Honor, I think it's better to say he's very close-shaven rather than bald, and I do apologize.

(ECF No. 16-20 at 84; *see also id.* at 102-03.) Repeating a mischaracterization of the record thereafter does not make the mischaracterization correct.

Third, only a *single* police officer witness observed the bald shooter; and it was that single officer who gave the description, referenced by a later responding officer, of the shooter as a bald—not "close-shaven"—white male.[28] *That* percipient witness officer,

---

[28]Petitioner cites to page 81 of the transcript for Officer Brown's description, but the description instead is found at page 87 of the transcript. (*See* ECF No. 14-8 at 88.)

Chad Brown, thereafter identified Gilbert Aguilar in the 7-Eleven surveillance video as the shooter, not a close-shaven white male from the video. Officer Brown further positively identified Gilbert Aguilar at trial as the bald shooter that he saw. (*See supra* at 12, 18.) As discussed previously regarding another ground, there in truth simply was no bald white male "mystery man" wherein a percipient witness initially described the bald male as white and did not thereafter identify Gilbert Aguilar as the bald male that they saw. (*See supra* at 32-33 n.14.) All of the witnesses who observed a bald male during the shooting spree identified that bald male as Gilbert Aguilar.

Fourth, in the reply, Petitioner urges that "[t]he fact that *the* witness who gave the description of the shooter identified Gilbert as the shooter in court has no bearing on this analysis" [because, *inter alia,*] "the identification occurred under highly suggestive circumstances, rendering it completely unreliable." (ECF No. 68 at 28.) (emphasis added).

Petitioner apparently has the witnesses mixed up. Petitioner challenged the identification testimony of *Joyce* Brown in Ground 6 as having been secured through an allegedly suggestive photographic lineup. *Joyce* Brown never identified anyone as a *shooter*. She instead saw Gilbert Aguilar openly carrying a rifle prior to the shooting spree and thereafter saw him running back across her yard afterwards. (*See supra* at 4, 12, 34.) Nor did she initially identify the individual that she saw as a bald white male rather than a bald *Hispanic* male. (*See* ECF No. 15-13 at 19.)

Rather, as noted previously, it was Metro Officer *Chad* Brown who initially described the shooter that he saw as a heavyset bald white male wearing a black tank top. (*See supra* at 12.) There is no exhausted claim before the Court challenging the identification testimony of *Chad* Brown due to an allegedly suggestive identification procedure. There further were no factual allegations presented in the Second Amended Petition, in Ground 9 or otherwise, alleging that Officer Brown's identification testimony had no bearing on the case because of a suggestive identification procedure. A petitioner may not raise claims or material factual allegations for the first time in the reply that were

///

not alleged in the petition. *E.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

Nor was Officer Chad Brown the only witness to identify Gilbert Aguilar during the shooting spree. The victim's wife, Marla Emerson, also positively identified Gilbert Aguilar as the bald male standing with a gun only feet from her mortally wounded husband. (*See supra* at 8.)

Thus, the identification testimony by the witness who initially described the shooter as a bald white male has not been challenged herein as being based on a suggestive identification procedure; the identification testimony that was challenged on that basis was by a witness who instead identified Gilbert Aguilar at other times during the incident and who did not initially describe him as a white male; and more than one witness identified Gilbert Aguilar as the bald male during the shooting spree. Again, there simply was no bald male observed during the shooting spree who was not ultimately identified, by multiple witnesses, as the then-bald Gilbert Aguilar.

Ground 9 as alleged and argued on federal habeas review thus is based on multiple fundamental mischaracterizations of the record. The claim is belied by the actual state court record on multiple points that go to the heart of the claim, and the claim is subject to rejection on that basis alone.

In David Aguilar's state post-conviction petition, it does not appear that Petitioner alleged a claim that trial counsel failed to investigate and pursue an alternative suspect theory based upon an allegation that a bald white male in the 7-Eleven surveillance video instead was the shooter. (*See* ECF No. 15-12 at 2-137.) Nor was any such claim asserted in the counseled supplemental points and authorities. (*See* ECF No. 16-14 at 11-14.) Nor was any such claim pursued thereafter during the testimony of David Aguilar's defense counsel when they were questioned on the first day of the state court evidentiary hearing. David Aguilar's post-conviction counsel did not ask his trial counsel any questions as to why they did not pursue an alternative suspect theory based upon a male with a closely-shaven head in the 7-Eleven surveillance video.

On examination by the State, lead trial counsel did discuss David Aguilar's overall theory of defense as to the brothers being "set up":

> Q. When you began your process of preparing to defend the defendant, Mr. Aguilar, did you ever sit down with him and discern his theory of defense or his story as to what occurred in the case?
>
> A. Yes.
>
> Q. What did he tell you?
>
> A. David told me that he had been in prison in the federal system. That he'd been beaten so badly that they cut his sentence short and let him out. That the federal government had a vendetta against him. And that they had been followed for sometime [sic] by a secret government organization that David thought was trying to kill him.
>
> He told me that the incident at the 7/Eleven when Gilbert was struck by an automobile that the person driving the automobile was a member of that covert federal team, and that he and Gilbert went back to the apartment, obtained their weapons and they were shooting across the field at the members of that team that they thought were trying to kill him.
>
> . . . . .
>
> Q. How well do you think that sort of theory of defense would have flown with a jury in Clark County back in 1997?
>
> A. I don't think they would have considered it seriously at all.
>
> Q. Did you make any attempts to verify any of the information that he gave you?
>
> A. No we didn't.

(ECF No. 16-19 at 81-83.) As discussed previously herein, counsel was concerned that pursuing such a paranoid government "set up" or conspiracy defense would impair the credibility of the defense and further cast Aguilar in an unsympathetic light even before the case possibly reached the penalty phase in the capital murder case. (*See also* ECF No. 16-20 at 61-62.)

An alternative suspect theory based upon a 7-Eleven white male was pursued for the first time when Gilbert Aguilar's trial counsel were questioned five months later during the continued evidentiary hearing. (*See id.* at 72-74, 78-79, 83-84, 101-03, 112-16.)

///

The record from the evidentiary hearing reflected on this point, *inter alia*, that: (1) the ethnicity of the male in the 7-Eleven video was, at best, uncertain, and no actual testimony was presented that the male was white (*id.* at 78);[29] (2) as discussed previously, the male had close-shaven hair rather than being bald (*id.* at 84); (3) it was, at best, debatable whether the male did or did not have a ponytail as would have been consistent with Joyce Brown's description (*id.* at 102-03); (4) Gilbert Aguilar had been either unable or unwilling to provide trial counsel with any information that might have been used to identify the individual or any other alternative suspect, nor did they ever gain any such information (*id.* at 73-74, 79, 83-84, 112-16); and (5) co-counsel for Gilbert Aguilar testified that "I don't believe we found anybody that matched the description that would stand up as a reliable alternate perpetrator" (*id.* at 115).

David Aguilar's counsel, again, never was asked any questions by Petitioner's counsel about a male at the 7-Eleven possibly being an alternative suspect.

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> [A]ppellants claim that trial counsel were ineffective for failing to investigate another defense.[FN5] Specifically, appellants claim trial counsel should have attempted to identify a man who was at the 7–11 and may have met the description of the shooter. Appellants fail to demonstrate that trial counsel were deficient. Trial counsel testified that they did not pursue this theory because it was impossible to identify who this man was. Further, trial counsel testified at the evidentiary hearing that the witness who gave the description of the shooter identified appellant Gilbert as the shooter in court. Therefore, the district court did not err in denying these claims.
>
> [FN5] To the extent that appellants claim that trial counsel were ineffective for failing to investigate whether the weapon had belonged to a police officer, this claim was discussed and rejected above.

(ECF No. 16-36 at 3-4.)

The state supreme court's rejection of this claim was neither contrary to nor an objectively unreasonable application of *Strickland*'s performance prong. Petitioner on this

---

[29]David Aguilar specifically alleged in his state petition that the individuals that approached the brothers while inside the 7-Eleven instead were Hispanic, not white. (*See* ECF No. 15-12 at 41.) Store clerk Ethan Weeks testified that the male involved in the parking lot altercation outside the store was black. (ECF No. 14-8 at 22-23.)

claim as well failed to overcome the strong presumption that defense counsel's attention to certain issues to the exclusion of others reflected trial tactics rather than sheer neglect. *Gentry*, 540 U.S. at 8. This claim is not supported by the actual evidence in the state court record. Petitioner posits that counsel failed to investigate an unidentified male appearing in the 7-Eleven surveillance video who allegedly matched the description of "several" police officers of one of the shooters as a bald white male. Yet the state court record does not reflect that the 7-Eleven male was bald or even that he was necessarily white. Nor does the state court record affirmatively reflect that the 7-Eleven male was dressed like the bald shooter. (*See supra* at 62.) Moreover, only one police officer actually observed one of the shooters and gave an initial description, to other officers, of that shooter as a bald white male. That witness ultimately identified the then-bald Gilbert Aguilar as the shooter that he saw, and multiple other witnesses also identified Gilbert Aguilar as being armed with a rifle immediately prior to and/or during the shooting spree. In short, no competent evidence, as opposed to uncorroborated argument, in the state court record actually supports a claim that there was a male at the 7-Eleven who matched the initial description given by the officer. Nor does the state court record support any claim that there was an unaccounted-for bald shooter who was not identified as Gilbert Aguilar by the witness who supplied the initial description. Moreover, David Aguilar's trial counsel, who was not asked specifically about the 7-Eleven male at the evidentiary hearing, otherwise had sound strategic reasons for not pursuing Aguilar's paranoid and credulity-straining theory that the brothers were "set up" as part of a government conspiracy. (*See supra* at 61-62.) On the record presented, the state supreme court clearly did not unreasonably apply *Strickland*'s performance prong.

Ground 9 does not provide a basis for federal habeas relief.[30]

_____

[30]Petitioner maintains in the reply that "trial counsel omitted another piece of valuable evidence which tends to suggest Aguilar's innocence: Officer Debecker's connection to the firearm used in the incident." (ECF No. 68 at 28.) As discussed as to Ground 5, the state court record reflects that counsel investigated the fact that the officer's stolen AK-47 had been used in the shooting spree; and that investigation produced no

63

# IV. CONSIDERATION OF A CERTIFICATE OF APPEALABILITY

Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant.

As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999). To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484.

As to claims rejected previously in the case on procedural grounds, the petitioner must show: (1) that jurists of reason would find it debatable whether the petition stated a valid claim of a denial of a constitutional right; and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* at 484. While both such showings must be made to obtain a COA, "a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." *Id.* at 485. Where a plain procedural bar is properly invoked, an appeal is not warranted. *Id.* at 484.

The Court denies a certificate of appealability as to all claims, for the reasons outlined below.

---

evidence of involvement by Officer Debecker. (*See supra* section III(A).) Combining two unsupported arguments—as to alleged involvement by Officer Debecker and alleged involvement by an unidentified male who was at a 7-Eleven—together would not have made either argument stronger, particularly when advanced as part of a strained defense of a government set up. As also discussed as to Ground 5, counsel further had sound strategic reasons for not seeking to introduce evidence that one of the AK-47s had been stolen from Debecker. (*See supra* section III(A).) Ground 9 represents a *post hoc* theory developed by post-conviction counsel during the latter part of the state evidentiary hearing that was never supported by the underlying state court record. Ground 9 further is inconsistent with Ground 8. If the "man left the store right before Petitioner, providing this individual plenty of time to do the shooting," then the Aguilar brothers similarly had plenty of time to do so. (*See* ECF No. 28 at 24.)

In Ground 5, Petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to: (a) present evidence that the AK-47-type rifle allegedly used in the murder had been stolen from a police officer; and (b) investigate the officer's alleged involvement in the murder and his alleged failure to report the theft prior to the murder. On the record presented, the state supreme court's rejection of the claim under the performance prong of *Strickland* was neither contrary to nor an objectively unreasonable application of clearly established federal law. The state court record tends to establish that the officer's stolen AK-47 was not the actual murder weapon, although it was used in the overall shooting spree. There further is no competent evidence in the state court record that the officer did not report his AK-47 stolen until after the murder. Lead counsel's best recollection thirteen years after trial was that the investigator did not uncover any evidence linking the officer to the murder. Petitioner presented no evidence that counsel ever were on notice of any additional actual specific facts—beyond the mere theft of the weapon—that would have prompted further investigation over and above that conducted at the time. Counsel further had valid strategic reasons for not presenting evidence only of the fact that the weapon had been stolen from a police officer, given that: (a) such evidence potentially may have opened the door to introduction of evidence in the guilt phase of one or both brothers' prior involvement in, *inter alia,* prior weapons offenses, including offenses involving theft of firearms and possession of large quantities of similar assault rifle type weapons; and (b) attempting to bootstrap the fact that the AK-47 had been stolen from a police officer into an uncorroborated claim that the officer was involved in the murder likely would have been viewed as unreasonable and paranoid by a jury. In the capital murder trial, counsel had to be concerned with how such a defense effort would impact not only the guilt phase but a potential penalty phase as well. Reasonable jurists would not find this Court's rejection of the claim on the merits to be either debatable or wrong, under the doubly deferential standard of review applicable under *Strickland*'s performance prong and AEDPA. (*See supra* section III(A).)

///

In Ground 6, Petitioner alleges that he was denied effective assistance when trial counsel failed to move to suppress identification evidence wherein witness Joyce Brown identified Petitioner's brother Gilbert Aguilar because he allegedly was in jail clothing in the photographic lineup and a detective stated to the witness that individuals might have grown their hair out. The state supreme court's rejection of the portion of the claim based on Gilbert Aguilar being in jail clothing was neither contrary to nor an objectively unreasonable application of *Strickland*'s performance prong. The evidence in the state court record tended to establish that Gilbert Aguilar's appearance was consistent with a non-detainee because to a person unfamiliar with local jail clothing he would appear to be just wearing a T-shirt. The state supreme court rejected the remainder of the claim because Aguilar did not include the trial transcripts in the appeal record. Applying an assumed *de novo* review to that portion of the claim, Petitioner cannot demonstrate either deficient performance or resulting prejudice. The detective's statement did not single out any individual in the photographic lineup and was not suggestive in the first instance. The identification evidence in any event otherwise was reliable under the factors in *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Braithwaite*, 432 U.S. 98 (1977). *Inter alia*, in contrast to the assertions in Petitioner's papers, Joyce Brown in fact had observed Gilbert Aguilar "maybe once, twice a day" for a "few days, maybe a week" prior to the incident when he was at her neighbor's residence with David Aguilar, with whom she already was familiar. Brown's view at the two points in time that she observed Gilbert Aguilar during the incident was clear and unobstructed, with adequate lighting. The remaining factors, on balance, similarly weigh in favor of reliability of the identification, despite Brown's initial failure to identify Gilbert Aguilar while looking first for a bald subject. Reasonable jurists would not find this Court's holding on either portion of the claim to be debatable or wrong. (*See supra* section III(B).)

In Ground 7, Petitioner alleges that he was denied effective assistance when trial counsel failed to move to suppress the results of the search of his girlfriend's residence on the basis that her consent to the search was not voluntary. The state supreme court

held that counsel did not render deficient performance because Aguilar did not have standing to challenge the search when it was undisputed that he was subject to a restraining order legally barring him from being at the girlfriend's residence, in which he otherwise had no prior legal possessory interest as an owner or lessee. The court's 2012 holding on the underlying standing issue was neither contrary to nor an objectively unreasonable application of United States Supreme Court pronouncements in *Rakas v. Illinois*, 439 U.S. 128 (1978), and prior case law that a defendant wrongfully present at a premises cannot invoke the privacy of the premises searched. David Aguilar otherwise could not assert any derivative standing based upon any alleged presence by Gilbert Aguilar at the residence, even as a coconspirator or aider and abettor. *E.g., United States v. Padilla*, 508 U.S. 77 (1993). The state supreme court's underlying standing holding is fatal, in all respects, to Petitioner's claim of ineffective assistance of trial counsel in connection with the October 1997 trial. Reasonable jurists would not find this Court's rejection of the claim on the merits to be either debatable or wrong with regard to *Strickland*'s performance prong. (*See supra* section III(C).)

In Ground 8, Petitioner alleges that he was denied effective assistance when trial counsel failed to challenge the introduction of a 7-Eleven surveillance video on the basis that the time stamp was inaccurate and the allegedly redacted portion of the video was not authentic. Petitioner posits that an authentic video with an accurate time stamp instead would have contradicted the State's timeline by establishing that the Aguilar brothers did not leave the 7-Eleven in time to engage in the shooting spree. On the record presented, the state supreme court's rejection of the claim under the performance prong of *Strickland* was neither contrary to nor an objectively unreasonable application of clearly established federal law. Counsel had good reason to believe that expert examination of the accuracy of the time stamp or the authenticity of any redaction of the tape would not lead anywhere useful because David Aguilar told him that he and his brother were shooting their weapons in the subdivision. Further, two 7-Eleven store clerks testified that they heard the shooting from the nearby subdivision fifteen to twenty minutes after the

Aguilar brothers left the store. Reasonable jurists would not find this Court's rejection of the claim on the merits to be either debatable or wrong, under the doubly deferential standard of review applicable under *Strickland*'s performance prong and AEDPA. (*See supra* section III(D).)

In Ground 9, Petitioner alleges that he was denied effective assistance when trial counsel failed to investigate an alternative suspect theory in pursuit of David Aguilar's assertion that the two brothers were "set up" pursuant to a government conspiracy. Petitioner posits that a bald white male in the 7-Eleven surveillance video fit the description of a bald white male shooter reflected in the testimony of "several" police officers. This claim is based upon multiple factual representations that either are belied by or are unsupported by the state court record. *Inter alia,* the man in the surveillance video was not bald; and the record did not establish his ethnicity. Only a single police officer saw the bald shooter. While that officer initially described the individual that he saw—shooting in the dark and then at him—as a bald white male, that officer positively identified the then-bald Gilbert Aguilar as the bald shooter that he saw. Petitioner urges that the identification of "the witness" has no bearing on the analysis because the identification was obtained through a suggestive procedure. However, he apparently confuses Officer *Chad* Brown with witness *Joyce* Brown, the subject of Ground 6; and she in any event described the man that she saw as Hispanic. At bottom, there was no unaccounted-for "mystery shooter" who initially was described as a bald white male by a witness where the witness did not positively identify Gilbert Aguilar as the shooter. Petitioner further urges that the description did not fit him, but he was tried as a jointly culpable coconspirator with and aider and abettor of Gilbert Aguilar. Against the backdrop of such a substantially unsupported claim, the state supreme court's rejection of this claim clearly was neither contrary to nor an objectively unreasonable application of *Strickland*'s performance prong. Petitioner did not overcome the strong presumption that counsel's attention instead to other defenses reflected trial tactics rather than neglect. Moreover, there were sound strategic reasons for not pursuing the paranoid "set up" defense.

68

1  Reasonable jurists would not find this Court's rejection of the claim on the merits to be

2  either debatable or wrong. (*See supra* section III(D).)

3       Reasonable jurists further would not find this Court's dismissal of the remaining

4  claims as procedurally defaulted and/or time-barred to be debatable or incorrect, for the

5  reasons previously assigned. (*See* ECF No. 64.) Following upon now its in-depth review

6  of the full trial record, the Court is even more convinced in particular that it is impossible

7  for Petitioner to pass through the actual innocence gateway of *Schlup v. Delo*, 513 U.S.

8  298 (1995).

9       A certificate of appealability accordingly will be denied as to all claims.

10 **V.   CONCLUSION**

11      It is therefore ordered that the remaining grounds in the Petition are denied on the

12 merits and that the Petition will be dismissed with prejudice.

13      It is further ordered that a certificate of appealability is denied.

14      The Clerk of Court is instructed to enter final judgment accordingly, in favor of

15 Respondents and against Petitioner, dismissing this action with prejudice.

16      DATED THIS 25th day of June 2018.

17

18  _____

19  MIRANDA M. DU
    UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28